No. 14448

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

DEWEY EUGENE COLEMAN,

Defendant and Appellant.

_____

Appeal from:  District Court of the Sixteenth Judicial District,
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellant:

Moses, Tolliver and Wright, Billings, Montana
Charles F. Moses argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mike McCarter argued, Assistant Attorney General,
Helena, Montana
John S. Forsythe, County Attorney, Forsyth, Montana

_____

Submitted:  January 29, 1979

Decided:  JUN 2 0 1979

Filed: JUN 2 0 1979

*Thomas J. Kearney*
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This matter comes before the Montana Supreme Court from the District Court, Sixteenth Judicial District, Rosebud County, under the automatic review provisions of sections 95-2206.12 through 95-2206.15, R.C.M. 1947, now sections 46-18-307 through 46-18-310 MCA. In felony convictions not involving the imposition of the death penalty, it is the function of this Court to review the record and determine if any errors have been committed resulting in the imposition of an illegal sentence, while it is the function of the Sentence Review Division to determine if a legal sentence is appropriate in the circumstances. State v. McKenzie (1978), ____ Mont. ____, 581 P.2d 1205, 1229, 35 St.Rep. 759; State v. Simtob (1969), 154 Mont. 286, 462 P.2d 873, 874; sections 46-18-901 to 905 MCA. However, when the death penalty has been imposed, the Legislature has directed this Court, because of the nature of the penalty involved, to undertake expeditiously both functions. Sections 46-18-307, -308 MCA; Minutes of State Senate Judiciary Committee, January 28, 1977. We recognize that in McKenzie the Sentence Review Division was allowed to conduct a review of the death penalty imposed, however, the defendant in McKenzie was sentenced under statutes different from those involved in this appeal. 581 P.2d at 1227. Because the review conducted by this Court statutorily stands in place of any recourse to the Sentence Review Division, the completion of this review will mark the end of state action upon this cause, excepting any action upon a petition for rehearing.

Defendant, Dewey Eugene Coleman has been sentenced to death for the crime of aggravated kidnapping under a judgment

-2-

and order entered by the District Court, July 10, 1978.

The facts on which Dewey Eugene Coleman was found guilty by a jury on November 14, 1976, are set out in his earlier appeal to this Court, which we decided April 26, 1978. State v. Coleman (1978), _____ Mont. _____, 579 P.2d 732, 35 St.Rep. 560. We need not repeat those incidents here.

Defendant had been convicted of the crimes of deliberate homicide, aggravated kidnapping, and sexual intercourse without consent, violations of sections 94-5-102, 94-5-303, and 94-5-503, R.C.M. 1947, now sections 45-5-102, 45-5-303, 45-5-503 MCA. By our decision in the Coleman appeal, we remanded the case to the District Court for resentencing on count II, aggravated kidnapping, and count III, sexual intercourse without consent. The judgment of conviction on count I, deliberate homicide and the sentence thereupon imposed, were affirmed.

The District Court on remand set a sentencing hearing "in accordance with section 95-2206.06 through 95-2206.11, R.C.M., as amended" for June 14, 1978. At that hearing, the court denied a motion of defendant to quash and ordered the presentence report be filed. Neither party presented any witnesses or other evidence.

Thereafter the court set July 10, 1978 as the date for sentencing. On that date, the District Court handed counsel for defendant and the State, a copy of its written findings, judgment and order. After argument was presented, the District Court then signed and filed its findings, judgment and order.

The District Court found and concluded that the aggravating circumstances set forth in section 93-2206.8(7),

-3-

R.C.M. 1947, existed because the offense of aggravated kidnapping had been committed by defendant and it had resulted in the death of the victim, Miss Peggy Harstad; that none of the mitigating circumstances listed in section 95-2206.9, were sufficiently substantial to call for leniency in this case; and that the only mitigating circumstance technically present was that the defendant had no record history of prior criminal activity.

By reason of his findings and conclusions, the District Court ordered that the defendant Dewey Eugene Coleman be hanged between the hours of 6:00 a.m. and 6:00 p.m. on the 31st day following the completion of the automatic review of his case by this Court, said execution to be supervised by the sheriff of Yellowstone County. The District Court further ordered that defendant be sentenced to a term of 20 years for the crime of sexual intercourse without consent, and that such sentence be served consecutively to his sentence of 100 years for deliberate homicide, which had previously been assessed against the defendant and which was not disturbed on his appeal.

As a result of his trial in November 1975, defendant was then sentenced by the District Court to 100 years on count I, deliberate homicide; to death by hanging on count II, aggravated kidnapping; and to 40 years on count III, sexual intercourse without consent inflicting bodily injury. One of the questions decided by this Court on the first Coleman appeal was that his sentence of death by hanging was invalid under the statutes then in effect.

At the time of defendant's trial, the death penalty statute in Montana for aggravated kidnapping was section 94-5-304, R.C.M. 1947. It read:

-4-

> "A court shall impose the sentence of death
> following conviction of aggravated kidnapping
> if it finds the victim is dead as the result
> of the criminal conduct."

Defendant was sentenced to death under this statute.

Section 94-5-304 which had been enacted in 1973 (Ch. 513, Laws of Montana (1973)) and amended in 1974 (Ch. 126, Laws of Montana (1974)) was repealed by the 1977 session of the State Legislature (Ch. 338, Laws of Montana (1977)). In the same enactment new death penalty statutes were codified in sections 95-2206.6 through 95-2206.15, R.C.M. 1947, now sections 46-18-301 through 46-18-310 MCA.

In the first Coleman appeal, we held that because former section 94-5-304 mandatorily imposed the death penalty, it was constitutionally impermissible under United States Supreme Court decisions in Woodson v. North Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982; and Roberts v. Louisiana (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637. This Court thereupon held that the death penalty assessed against defendant on November 21, 1975, must be set aside and, for reasons not important here, that the 40 year sentence on the count of sexual intercourse without consent must also be set aside. We remanded the case to District Court for resentencing on the counts of aggravated kidnapping and sexual intercourse without consent, without instructions to the District Court as to which law was applicable with respect to the resentencing of the defendant.

When the cause was received by the District Court on remand, the District Court determined that it would apply the new sentencing statutes that included the death penalty. The District Court then used the 1977 statute to assess the death penalty against defendant.

-5-

Defendant raises 19 specifications of error in this appeal. We will discuss these alleged errors within the broader context of the issue to which they relate. We frame the issues presented in this review in the following manner:

1.   Did defendant's conviction on the count of deliberate homicide and the count of aggravated kidnapping constitute double jeopardy?

2.   Were the present Montana capital punishment provisions, sections 95-2206.6 through 95-2206.15, R.C.M. 1947, now sections 46-18-301 through 46-18-310 MCA applicable in resentencing defendant?

3.   Do Montana's capital punishment provisions violate constitutional standards?

4.   Was defendant denied a fair opportunity to present argument and evidence with respect to sentencing?

5.   Is defendant's sentence of death disproportionate to his crime with respect to sentences imposed in similar cases, or was it the product of passion, prejudice or other arbitrary factors?

6.   If the capital punishment provisions are valid and applicable, must this Court, in its review of the sentence, reconsider issues raised and disposed of in defendant's first appeal?

We first address the issue raised by defendant that his conviction of aggravated kidnapping, in light of his conviction of deliberate homicide based upon the felony of kidnapping, has placed him twice in jeopardy. Defendant contends the aggravated kidnapping conviction is barred by the Fifth Amendment to the United States Constitution and the 1972 Montana Constitution, Art. II, §25. Defendant

-6-

also argues this conviction is barred statutorily by section 95-1711, R.C.M. 1947, now section 46-11-501, -502 MCA.

The Fifth Amendment to the Federal Constitution states no person shall "be subject for the same offense to be twice put in jeopardy . . ." The 1972 Montana Constitution Art. II, §25, states "no person shall be again put in jeopardy for the same offense." Defendant has been subjected to but one trial, however, these double jeopardy provisions also protect offenders from multiple punishment for the same offense. Ex Parte Lange (1873), 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872; Matter of Ratzlaff (1977), _____ Mont. _____, 564 P.2d 1312, 1316, 34 St.Rep. 470.

Defendant has contended his conviction on the count of deliberate homicide is upon the same set of facts as his conviction on the count of aggravated kidnapping, thus he has been exposed to double jeopardy. We determine the prohibition against double jeopardy has not been violated in this case.

Count I of the information charging defendant reads as follows:

> "Count I: That the defendant purposely and knowingly caused the death of another human being, to-wit: Peggy Lee Harstad, while engaged in the commission of the following felonies:
>
> "Kidnapping and Sexual Intercourse Without Consent, involving the use of physical force and violence against the said Peggy Lee Harstad."

Count II of the information reads as follows:

> "Count II: That the defendant knowingly and purposely and without lawful authority restrained another person, to-wit: Peggy Lee Harstad, by holding her in a place of isolation and by using physical force to facilitate the Commission of a felony, to-wit: Sexual Intercourse Without Consent

-7-

and for the purpose of inflicting bodily injury on and terrorizing the said victim, Peggy Lee Harstad, resulting in the death of Peggy Lee Harstad."

The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306:

> "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not . . ." (Emphasis added.)

As the United States Supreme Court noted in Brown v. Ohio (1977), 432 U.S. 161, 166, 97 S.Ct. 2221, 53 L.Ed.2d 187, this test emphasizes the elements of the two crimes. Rejecting a defendant's claim of double jeopardy, this Court stated in State v. Davis (1978), _____ Mont. _____, 577 P.2d 375, 35 St.Rep. 381, "'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'" 577 P.2d at 377. (Quoting from Morey v. Commonwealth (1871), 108 Mass. 433.) Thus, our inquiry in the present appeal is directed to the elements of proof necessary to establish each count of the information.

To establish count I of the information the prosecution had to prove the defendant (1) purposely and knowingly (2) caused the death of another human being (3) while committing the felonies of kidnapping and (4) sexual intercourse without consent. To establish count II of the information the prosecution

-8-

had to prove the defendant (1) knowingly and purposely (2) without lawful authority (3) restrained another person by holding her in a place of isolation and by using physical force (4) to facilitate the commission of sexual intercourse without consent and (5) for the purpose of inflicting bodily injury on and terrorizing the victim. Both counts required proof of a "purposely and knowingly" mental state, proof of kidnapping and proof of sexual intercourse without consent. However, count I, in addition, required proof of the death of the victim which count II did not; and count II required proof of a purpose to inflict bodily injury and terrorize the victim which count I did not. The offenses of deliberate homicide (former section 94-5-102, R.C.M. 1947, now section 45-5-102 MCA) and aggravated kidnapping (former section 94-5-302, R.C.M. 1947, now section 45-5-302 MCA) are separate and distinct offenses in our codes and each requires proof of elements the other does not. Therefore, defendant may be convicted and sentenced for both count I and count II of the information without violating the double jeopardy prohibition even though the counts arose from the same conduct or episode. Brown, 432 U.S. at 166; United States v. Eagle (8th Cir. 1978), 586 F.2d 1193, 1196 (defendant's conviction of assault with a deadly weapon and assault resulting in serious bodily injury each arising from same shooting incident affirmed); Kowalski v. Parratt (8th Cir. 1976), 533 F.2d 1071, 1073-74 cert.den. 429 U.S. 844, 50 L.Ed.2d 115, 97 S.Ct. 125, (conviction of robbery and using a firearm in commission of same robbery affirmed); Smith v. Gaffney (10th Cir. 1972), 462 F.2d 663, 665-666 (conviction of burglary and larceny based upon same transaction affirmed); Davis, 577 P.2d at 377.

-9-

Arguments made by defendant in this appeal were also made by the defendant in Williams v. Oklahoma (1959), 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516. There the defendant had kidnapped and murdered his victim. He pled guilty to the murder charge and received a life sentence. Defendant was then charged with kidnapping, pled guilty and received the death penalty after the sentencing court considered the homicide as an aggravating circumstance. Defendant challenged the death sentence on the grounds it was disproportionate to the life sentence given him for the homicide and on the grounds it constituted a second punishment for the same crime. The United States Supreme Court rejected defendant's claims stating Oklahoma law clearly made kidnapping and homicide separate and distinct offenses; therefore there was no merit in the argument that the "lesser crime" of kidnapping "merged" into the "greater crime" of murder so as to bar any sentence, or at least a greater sentence than was imposed for the homicide. 358 U.S. at 587. The Court also stated:

> "[T]he Due Process Clause of the Fourteenth Amendment does not, nor does anything in the Constitution, require a State to fix or impose any particular penalty for any crime it may define or to impose the same or 'proportionate' sentences for separate and independent crimes. Therefore we cannot say that the sentence to death for the kidnapping, which was within the range of punishments authorized for that crime by the law of the State, denied to petitioner due process of law or any other constitutional right." 358 U.S. at 586. (Emphasis added.)

We conclude defendant's conviction of both count I, deliberate homicide, and count II, aggravated kidnapping, did not transgress any constitutional inhibitions, federal or state, against double jeopardy.

Defendant has also argued his aggravated kidnapping conviction is barred by the operation of section 95-1711(2), R.C.M. 1947, now section 46-11-502 MCA. Defendant argues the

-10-

aggravated kidnapping count is an "included offense" in the count of deliberate homicide and he therefore may not be, under section 95-1711(2)(a), now section 46-11-502 (1) MCA, convicted of that count. Section 95-1711(1)(b), R.C.M. 1947, now section 46-11-501(2)(a) MCA, defines "included offense" in pertinent part as an offense "established by proof of the same or less than all the facts required to establish the commission of the offense charged." An accused may not be convicted of more than one offense if one offense is included in the other. Section 95-1711(2)(a), R.C.M. 1947, now section 46-11-502(1) MCA. However, as the discussion above makes clear, to establish deliberate homicide and to establish aggravated kidnapping require proof of distinct and separate elements. In such a case the statutory provisions recited do not bar the conviction for aggravated kidnapping, State v. Perry (1979), _____ Mont. _____, 590 P.2d 1129, 1131, 36 St.Rep. 291, and defendant's double jeopardy claim fails on this point as well.

The next issue with which we are confronted is whether ex post facto provisions in the federal and state constitutions or the statutorily codified rule of construction against retroactivity (section 12-201, R.C.M. 1947, now section 1-2-109 MCA) prevent application of the sentencing statutes enacted in 1977 to this defendant. As was indicated in the recitation of facts, defendant committed the crime with which he was charged in 1974, however, upon resentencing after our remand, the District Court applied the statutes enacted in 1977. Defendant argues this violates the constitutional prohibition against ex post facto laws as well as the statutory provision against retroactivity. Defendant further argues he is entitled to be sentenced under the law in effect at the time the crime was committed. Because this Court has declared the provision

-11-

mandating the death penalty which was effective at that time to be unconstitutional, defendant contends the maximum sentence he may receive is 100 years in prison.

In considering this issue, it must be initially determined what would cause the application of the 1977 statutes to an act committed in 1974 to run afoul of the ex post facto prohibition and the statutory rule of construction against retroactivity. Therefore what makes a statute ex post facto or "retroactive" becomes the keystone consideration. Simply because a statute operates on events antecedent to its effective date does not make the statute ex post facto, Calder v. Bull (1798), 1 U.S. (3 Dall.) 269, 273, nor does such operation make a law prohibitively retroactive. Cox v. Hart (1922), 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332. Thus the effect the statute will have must determine its validity with respect to ex post facto or retroactive inhibitions.

The constitutional prohibition against ex post facto laws has its roots in the desire on the part of the framers of the United States Constitution to prevent the sovereign authority from making acts criminal which were innocent when committed as had been done by the British crown. Calder, 1 U.S. at 271-272. The Court in Calder noted the advocates of such laws were stimulated by ambition, or personal resentment and vindictive malice and "to prevent such, and similar acts of violence and injustice . . . the federal and state legislatures were prohibited from passing any . . . ex post facto law." Calder. The constitutional inhibition of ex post facto laws was thus intended "to secure substantial personal rights against arbitrary and oppressive legislative action." Malloy v. South Carolina (1915), 237 U.S. 180, 183, 35 S.Ct. 507; 59 L.Ed. 905; Beazell v. Ohio (1925), 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216.

-12-

Summarizing more than a century of definitions Justice Stone writing for a unanimous court in <u>Beazell</u> stated that:

> "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as <u>ex post facto</u>. The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that <u>the criminal quality attributable to an act</u>, either by the legal definition of the offense or by the nature or amount of punishment imposed for its commission, <u>should not be altered by legislative enactment, after the fact, to the disadvantage of the accused</u>." 269 U.S. at 169-170. (Emphasis added.)

Clearly the important question in determining whether a subsequent statute and its application transgress this inhibition is whether some substantial right of the accused is materially affected. However, the Supreme Court has iterated the proposition that changes in procedure not affecting materially the rights of a defendant do <u>not</u> come within the constitutional prohibition.

For example, the State of Utah altered its rule governing the qualifications of witnesses, allowing felons to testify, after the accused committed the act but before his trial. The Court in Hopt v. Territory of Utah (1884), 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262, dismissed the <u>ex post facto</u> claim based on this change even though the change had detrimental effect stating:

> ". . . [A]lterations which do not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt, but--leaving untouched the nature of the crime and the amount or degree of proof essential to conviction--only removes restrictions upon the competency of certain classes

-13-

> of persons as witnesses, relate to modes of
> procedures only, <u>in which no one can be said</u>
> <u>to have a vested right, and which the state,</u>
> <u>upon grounds of public policy, may regulate</u>
> <u>at pleasure."</u>  110 U.S. at 590.  (Emphasis
> added.)

Although the Court in Thompson v. State of Utah (1898), 170

U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061, found the change from

requiring a panel of 12 jurors to requiring a panel of 8, to

have substantially affected the accused's rights and there-

fore be <u>ex post facto</u>, it stated no one had a vested right

in mere modes of procedure.  170 U.S. at 352.  Furthermore,

"statutes regulating procedure, if they leave untouched all

the substantial protections with which existing law surrounds

the person accused of crime, are not within the constitutional

inhibition of <u>ex post facto</u> laws."  170 U.S. at 352.  In

Dobbert v. Florida (1977), 432 U.S. 282, 92 S.Ct. 2290, 53

L.Ed.2d 344, the Supreme Court held that the trial and

sentencing of the accused under statutes not in effect at

the time of his crime did not violate <u>ex post facto</u> prohibitions.

The Court ruled the changes were merely procedural, were

less onerous than the law that had been previously declared

unconstitutional, and did not change the quantum of punish-

ment attached to the crime.  432 U.S. at 292, 294.

The inhibition upon <u>ex post facto</u> laws then, does not

give an accused a right to be tried, in all respects, by the

law in force when the crime charged was committed providing

he has not been deprived of any substantial right or immunity

he possessed at the time of the commission of the offense
293-294
charged. <u>Dobbert</u>, 432 U.S. at/; <u>Malloy</u>, 237 U.S. at 183;

Gibson v. Mississippi (1896), 162 U.S. 565, 590, 16 S.Ct.

904, 40 L.Ed. 1075.  However, the Court has made clear a

change which is labeled procedural will not except it from

<u>ex post facto</u> prohibitions if it invades or modifies rights

of a party charged with a crime.  Kring v. Missouri (1883),

-14-

107 U.S. 221, 232, 2 S.Ct. 443, 27 L.Ed. 506. (The change in Kring made evidence that was conclusive of innocence not a factor at all, and in effect increased the punishment for the offense.) Just what changes in "procedure" will be held to be of sufficient moment:

> ". . . to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure which do not effect matters of substance." (Citations omitted.) Beazell, 269 U.S. at 171.

The Supreme Court has also stated a statute which, when viewed in the light of reason and common sense, mitigates the rigor of the law in force at the time a crime was committed cannot be regarded as ex post facto with reference to that crime. Rooney v. North Dakota (1905), 196 U.S. 319, 325, 25 S.Ct. 264, 49 L.Ed. 494; Calder, 1 U.S. at 273.

Section 12-201, R.C.M. 1947, now section 1-2-109 MCA, states that no law is "retroactive" unless expressly so declared. However, this is but a rule of construction and what is "retroactive" so as to warrant application of the rule has been defined judicially by this and other courts. A statute is not "retroactive" merely because it draws upon antecedent facts for its operation. Cox v. Hart, 260 U.S. at 157. A statute is "retroactive" in a legal sense "which takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty or attaches a new disability in respect to transactions already past." City of Harlem v. State Highway Commission (1967), 149 Mont. 281, 425 P.2d 718, 720; Dunham v. Southside National Bank (1976), 169 Mont. 466, 548 P.2d 1383, 1386; Butte & Superior Mining Co. v. McIntyre (1924), 71 Mont. 254, 229 P. 730; Sturges v. Carter (1885), 114 U.S. 511, 5 S.Ct. 1014, 29 L.Ed. 240.

In 1973, the legislature enacted section 94-5-303, R.C.M. 1947, now section 45-5-303 MCA, and section 94-5-304, R.C.M. 1947. Ch. 513, Laws of Montana (1973). The former section set forth the elements of the crime of aggravated kidnapping and stated "a person convicted of aggravated kidnapping shall be punished by death as provided in section 94-5-304 or [imprisonment] . . ." (Emphasis added.) Section 94-5-304, as it then read, imposed the death penalty if the victim dies as a result of the criminal conduct "unless there are mitigating circumstances." The quoted language was deleted by the 1974 amendment to section 94-5-304, making the death penalty mandatory in those circumstances specified. Ch. 126, Laws of Montana (1974). Section 94-5-304 was repealed in 1977 by Ch. 338, Laws of Montana (1977) which enacted the current scheme for imposition of the death penalty; that is, providing for a separate sentencing hearing; consideration of mitigating or aggravating circumstances, written findings and conclusions, and expedited review of the sentence. It is important to note that the original enactment of section 94-5-303(2), now section 45-5-303(2) MCA, effective when the crime involved here was committed, was never altered by the amendments and has always provided the crime of aggravated kidnapping shall be punished by death or imprisonment. The amendments have related only to the procedure the court must follow in imposing the sentence.

The 1974 amendment, effective when the crime was committed, mandated a death penalty if the victim died as a result of the criminal conduct. The 1977 amendments ameliorated this, allowing an exercise of judicial discretion within certain limits and requiring consideration of mitigating circumstances. Clearly, the latter amendments lessened the rigor of the 1974 amendment and are less onerous than the 1974 law. As such/ they,

-16-

on their face, cannot be considered ex post facto. Calder v. Bull, 1 U.S. at 273; Rooney v. North Dakota, 196 U.S. at 325; Dobbert v. Florida, 432 U.S. at 292-294. Because the accused has no vested right in modes of procedure not materially affecting his rights, and because the changes in the law on their face do not impose new obligations or duties or disabilities in respect to transactions already past, the changes are also not on their face retroactive. City of Harlem, 425 P.2d at 720; McIntyre, 229 P. at 733. In fact, had there been no declaration of unconstitutionality in the first Coleman decision, the District Court may well have been obligated to apply the 1977 statutes as their changes benefited the accused. Marks v. United States (1977), 430 U.S. 188, 197, 97 S.Ct. 990, 51 L.Ed.2d 260.

Because this Court did declare the 1974 amendment mandating the death penalty unconstitutional, the ex post facto and "retroactive" arguments are raised by defendant. Thus, the crucial question becomes what is the effect of that declaration. It must be emphasized the decision in Coleman, declared unconstitutional only section 94-5-304 as amended in 1974. The preceding section 94-5-303, enumerating the elements of the crime and the potential punishment was not addressed by the decision and has remained viable since its enactment in 1973.

There exists a rule of statutory construction that a statute declared unconstitutional is considered void ab initio and has no effect. This proposition is best typified by the following statement of Justice Field in Norton v. Shelby (1886), 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178: "an unconstitutional act is not a law; it confers no

-17-

rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." The aim of such a rule of construction is to hold the exercise of legislative power in excess of constitutional limits to be of no effect. Field, The Effect of an Unconstitutional Statute (1935), pp. 8-12. The author of the cited treatise, however, indicated the absoluteness of such a doctrine was breaking down and applauded such development. Field, p. 12. Indeed, the United States Supreme Court, which first announced the doctrine, has indicated the rule is not absolute and has further indicated its recession from that rule.

In Chicot County Drainage District v. Baxter State Bank (1940), 308 U.S. 371, 374, 60 S.Ct. 317, 84 L.Ed. 329, where the validity of a judicial decree based upon a statute subsequently declared unconstitutional was questioned, the Court indicated the broad statement that appeared in Norton must be taken with qualifications and in a later decision, the Supreme Court stated:

> ". . . the effect of a given constitutional
> ruling on prior conduct 'is subject to no
> set "principle of absolute retroactive in-
> validity" but depends upon a consideration
> of "particular relations . . . and particular
> conduct . . . of rights claimed to have become
> vested, of status, of prior determinations deemed
> to have finality" and "of public policy in the
> light of the nature both of the statute and of its
> previous application."' . . . However appealing
> the logic of Norton may have been in the
> abstract, its abandonment reflected our recognition
> that statutory or even judge-made rules of law
> are hard facts on which people must rely in
> making decisions and shaping their conduct."
> Lemon v. Kurtzman (1973), 411 U.S. 192, 198-199,
> 93 S.Ct. 1463, 36 L.Ed.2d 151. (Emphasis added.)
> (quoting from Linkletter v. Walker (1965), 381
> U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 and Chicot
> County Drainage Dist., supra.)

Both Chicot County and Lemon are civil cases but the case which announced the rule, Norton v. Shelby was also a civil action. This Court in Ex Parte Anderson (1951), 125 Mont. 331, 238 P.2d 910, 913, stated "an unconstitutional law is void, and is as no law. An offense created by it is not a crime." The Court then invalidated an entire criminal statute because it had been preempted by federal action in the same area. In the first Coleman appeal, the statute declared unconstitutional did not define the crime, rather related only to the procedure of imposing sentence. Our action in declaring the prior statute unconstitutional did not affect the substantial elements of the crime. Moreover, the statement relied upon by the Anderson Court, found in Ex Parte Siebold (1879), 100 U.S. 371, 376, 25 L.Ed. 717, was dicta in Siebold as the Supreme Court did not find the statute there in question to be unconstitutional.

There are "hard facts" present in this appeal which this Court must consider in making its determination. A fundamental concept of our constitutional liberty is that the ex post facto clause is based upon the principle that persons have the right to fair warning of conduct which will give rise to criminal penalties. Marks v. United States, 430 U.S. at 191. The substantive portion of the aggravated kidnapping statute, enumerating the elements of the crime and declaring the quantum of punishment, has not been altered since its enactment in 1973. The changes made by the 1977 statutes from the 1974 law ameliorated a mandatory death penalty to one imposed only after certain procedural steps were taken. Those procedural steps were followed in the resentencing of Dewey Coleman. At the time the crime was committed the statutes were clear that the penalty of death was a very probable consequence for the commission of the crime.

-19-

The defendant has cited this Court to cases from this and other jurisdictions and urged us to follow their precedent and hold the statutes in question here may not be applied to defendant. However, those cases can be distinguished. In State v. Rodgers (1978), 270 S.C. 285, 242 S.E.2d 215, the defendants were tried, convicted and sentenced under death penalty statutes enacted in 1974. Those statutes were later ruled unconstitutional. The State then petitioned to have the defendants resentenced under statutes promulgated in 1977 which were very likely constitutional. Those statutes provided for procedural safeguards at all phases of the criminal adjudication process from pretrial to sentencing. The South Carolina Supreme Court denied the State's petition because the defendants therein did not receive all the procedural safeguards mandated by the 1977 enactments. 242 S.E.2d at 218. In the present cause the safeguards enacted in 1977 related only to the sentencing phase of the criminal adjudication process and the defendant here did receive those protections. In People v. Teron (1979), 151 Cal.Rptr. 633, 588 P.2d 773, the California Supreme Court refused to apply sentencing provisions enacted in 1977 to a crime committed in 1975. The statutes in effect in 1975 had been declared unconstitutional. 588 P.2d at 780. Factually the Teron case is distinguishable from the one here, because the declaration of unconstitutionality occurred in 1976 while defendant was not charged with the crime until April 1977 and the 1977 statutes did not become effective until August 1977. Therefore, when the defendant was charged with his crime there existed in fact no constitutional death penalty statutes in California. 588 P.2d at 780. Here Coleman committed the crime in 1974, was tried, convicted and sentenced

-20-

in 1975, the legislature repealed the 1974 act in 1977, and this Court declared the 1974 law unconstitutional in 1978. Unlike Teron, Coleman was tried, and convicted under constitutional statutes, but sentenced under a statute later declared unconstitutional.

State v. Lindquist (1979), ____ Idaho _____, 589 P.2d 101, is the strongest authority for Coleman's "retroactive" argument. There the defendant committed his crime in 1975, was tried, convicted and sentenced in 1976. The laws were amended in 1977 and when the Idaho court considered the appeal, after declaring the laws in effect in 1975 and 1976 to be unconstitutional, it was faced with the question whether the 1977 laws could be applied on resentencing. The Court held they could not, on the basis they were retroactive. 589 P.2d at 103. However, the majority opinion devotes no discussion to what constitutes a retroactive law, assuming apparently that because the application of the 1977 laws would relate to events antecedent to their effective date, they are retroactive. 589 P.2d at 103, 104. Clearly such a discussion is necessary for, as the above discourse indicates, not all statutes relating to events antecedent to the effective date of the statutes are retroactive. The dissent of Justice Donaldson in Lindquist discusses this point. 589 P.2d at 112, 113. Thus the Lindquist opinion loses some of its authoritative impact for this lack.

Finally, in State v. Gone (1978), _____ Mont. _____, 587 P.2d 1291, 35 St.Rep. 1540, this Court held that, based upon the facts there present, the application of laws enacted after the crime was committed would violate ex post facto prohibitions. 587 P.2d at 1297. In Gone, a later statute permitted the sentencing court to impose a sentence without the possibility of parole, a discretion not granted under laws in effect when the crime was committed. Clearly this

-21-

later enactment allowed the punishment for the offense to be aggravated beyond that available when the offense was committed and was obviously ex post facto. However, here the later enactments do not aggravate the punishment for the crime, but only change the procedure for imposing the sentence. The punishment for the crime according to section 94-5-303(2), R.C.M. 1947, now section 45-5-303(2) MCA, has always been death or imprisonment.

The changes made by the 1977 enactments affected only the manner in which the penalty indicated by statute was to be determined and imposed. They did not deprive Coleman of any defense previously available nor affect the criminal quality of the act charged. Nor did they change the legal definition of the offense or the punishment to be meted out. They did not make an act criminal which was innocent when done; they did not increase the penalty for the crime. The quantum and kind of proof required to establish guilt, and all questions which may be considered by the court and jury in determining guilt or innocence, remained the same. No substantial right or immunity possessed by Coleman at the time of the commission of the offense was taken away by the 1977 enactments. Indeed they eased the rigor of the law as it existed at the time the offense was committed.

> "'. . . so far as mere modes of procedure are concerned, a party has no more right, in a criminal than a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice . . . in existence

when its facts arose. The legislature may . . .
prescribe altogether different modes of procedure
in its discretion, though it cannot lawfully . . .
dispense with any of those substantial protections
with which the existing law surrounds the person
accused of the crime.'" Thompson v. State of Utah,
170 U.S. at 351, 352 (quoting with approval from
Cooley on Constitutional Limitations); People v.
Ward (1958), 50 Cal.2d 702, 328 P.2d 777, 780.

The statutes in question also did not impair vested rights,
or create new duties, obligations, or disabilities with
respect to transactions already past.

Only if we were to adhere rigidly to the rule of construction
announced in Norton v. Shelby, supra, that a statute declared
unconstitutional is treated as never having had an operational
effect, could the 1977 statutes be read to interfere with
the substantial rights of Dewey Coleman. Yet the absolute
application of this rule has been abandoned by the Court
which promulgated it, the United States Supreme Court. To
follow the rule here, as this Court must in order to find an
ex post facto violation or "retroactive" effect, would be
impliedly stating Dewey Coleman at the time he committed his
crime had the omniscience that four years hence the statute
prescribing the procedure for imposing the penalty for the
crime would be declared unconstitutional and that at the
time the crime was committed no valid procedure existed.
Clearly such a conclusion stretches reason to the breaking
point.

We therefore hold that the District Court properly
applied the 1977 statutes relating to the imposition of the
death penalty to this defendant.

Having decided no ex post facto violations nor transgressions
of the rule against retroactive statutes have occurred, and
the 1977 statutes are applicable here, we reach defendant's
arguments that these statutes are unconstitutional. At the
outset, we note the Supreme Court has held the punishment of

-23-

death does not invariably violate the constitutional prohibition against cruel and unusual punishment. Gregg v. Georgia (1976), 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859. Furthermore, the Gregg court indicated that in the abstract, a penalty is not excessive if it does not involve the wanton and unnecessary infliction of pain and is not grossly out of proportion to the severity of the crime. 428 U.S. at 173. Finally, the court stated it must presume the validity of a punishment selected by a democratically elected legislature. 428 U.S at 175.

As we stated in State v. McKenzie (1978), _____ Mont. _____, 581 P.2d 1205, 1228, 35 St.Rep. 759, the United States Supreme Court in its decisions of Gregg; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, seems to have established three general criteria which are requisite to a valid scheme for imposing the death penalty. First, there must be at least one statutory aggravating circumstance before a death sentence may be considered. Second, the defendant must be afforded the opportunity to bring before the sentencing body at a separate sentencing hearing any mitigating circumstances relating to the individual defendant. Third, there must be available prompt judicial review of the sentencing decision by a court of statewide jurisdiction, providing a means to promote the evenhanded, rational and consistent imposition of death sentences under the law. A refinement of the second criterion was added by the decision in Lockett v. Ohio (1978), _____ U.S. _____, 98 S.Ct. 2954, 57 L.Ed.2d 973, that the sentencing body must not be precluded from considering any aspect of the defendant's record or character as a mitigating factor. 57 L.Ed.2d at 980. The death penalty must also not be imposed mandatorily without only consideration of mitigating factors. Coleman, 579 P.2d at 741-742.

-24-

Sections 95-2206.6 and 95-2206.7, R.C.M. 1947, now sections 46-18-301 and -302 MCA provide for a separate sentencing hearing in death penalty cases at which the sentencing court may consider any evidence relevant to the sentence and at which the defense may argue against the penalty. Sections 95-2206.8 through 2206.10, R.C.M. 1947, now sections 46-18-303 through -305 MCA enumerate aggravating and mitigating factors to be considered and direct the sentencing court to consider one against the other. Section 95-2206.11, R.C.M. 1947, now section 46-18-306 MCA provides for written findings supporting the determination of the court in cases where a death penalty is imposed. Sections 95-2206.12 through -2206.15, R.C.M. 1947, now sections 46-18-307 through -310 MCA provide for an expedited review of the death penalty sentence and set forth standards by which this Court must review the sentence.

Defendant argues sections 95-2206.8, -2206.9, -2206.10, R.C.M. 1947, now sections 46-18-303, -304, -305 MCA do not allow for the proper consideration of mitigating circumstances and in effect impose a mandatory death penalty should one of the statutory aggravating circumstances be found. Defendant's conception of the operation of these provisions is much too restricted and we do not agree that they in effect mandate a death penalty whenever an aggravating circumstance is found.

Section 95-2206.10, R.C.M. 1947, now section 46-18-305 MCA, instructs the sentencing court to take into account the aggravating and mitigating circumstances enumerated in sections 95-2206.8 and -2206.9 and to impose a sentence of death "if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." (Emphasis added.)

The United States Supreme Court has held the Eighth and Fourteenth Amendments require consideration of the character

-25-

and record of the individual offender and the circumstances of the particular offense in a determination whether to impose the death penalty. Woodson v. North Carolina (1976), 428 U.S. at 303-305. In Jurek, the Court had before it a statutory scheme that explicitly mentioned only aggravating circumstances, yet the Court found the scheme constitutional in light of the Texas Appeals Court's construction of the scheme requiring consideration of mitigating factors. 428 U.S. at 272-273. Clearly Montana's statutes go farther than those approved in Jurek by explicitly requiring consideration of mitigating circumstances, thus making subjective the sentencing determination as required by Woodson. We do not read sections 95-2206.8 through 95-2206.10, R.C.M. 1947, now sections 46-18-303 through 46-18-305 MCA as mandating the death penalty upon the finding of an aggravating circumstance, but rather as requiring consideration of whatever mitigating circumstances exist to determine if they outweigh the aggravating circumstances found to be present.

Defendant argues that Montana's death penalty statutes would be subject to reversal by the U.S. Supreme Court because of that court's decision in Lockett v. Ohio, supra, and its vacation and remand in light of Lockett in Jordan v. Arizona (1978), ____ U.S. _____, 98 S.Ct. 3138, 57 L.Ed.2d 1157. An examination of these cases leads us to the opposite conclusion. Basically Lockett held a sentencing entity should not be precluded from considering any aspect of a defendant's character or record as a mitigating factor. The Ohio statutes enumerated three mitigating factors to be considered in imposing the death penalty and the Supreme Court read this as limiting the range of factors considered and to exclude other possibly relevant factors. 57 L.Ed.2d at 991-992. Similarly in Jordan, the Arizona scheme enumerated mitigating

-26-

factors and required their consideration in language identical to Montana's statute. See Jordan v. Arizona (1976), 114 Ariz. 452, 561 P.2d 1224. However, the Arizona enumeration, like the Ohio enumeration is on its face exclusive, thus warranting the vacation of the death penalty and remand in light of Lockett. Montana's statute does not suffer from this defect. Although it enumerates mitigating factors, section 95-2206.9(1) through (7), R.C.M. 1947, now section 46-18-304(1) through (7) MCA, it also clearly indicates the sentencing body should consider any other fact existing in mitigation of the penalty. Section 95-2206.9(8), R.C.M. 1947, now section 46-18-304(8) MCA. This inclusive factor was not present in either the Ohio or Arizona scheme.

Defendant also contends because he received the death penalty for aggravated kidnapping but only a life sentence for deliberate homicide, the death penalty imposed constitutes the cruel and unusual punishment prohibited by the Eighth Amendment. We do not agree. As was made clear in Williams there is no constitutional requirement for the same or proportionate sentences when the crimes are separate and independent. 358 U.S. at 586. We have indicated above the crimes of deliberate homicide and aggravated kidnapping are separate and independent crimes and defendant's conviction of each violated no double jeopardy protections. Furthermore, the Supreme Court in Gregg, made clear "when a life has been taken by an offender [it cannot be said] the punishment [of death] is invariably disproportionate to the crime." 428 U.S. at 187. The decision of the Court in Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, is relevant only to crimes for which the penalty has been imposed which did not result in the loss of a life. Such is not the case here.

We have considered defendant's contentions with respect to jury participation in the sentencing procedure and with

-27-

respect to statutory requirements of a finding of guilty beyond a reasonable doubt in a case where death is a possible penalty and determine these contentions do not alter our conclusion as to the constitutionality of sections 95-2206.6 through 95-2206.15, R.C.M. 1947, now sections 46-18-301 through -310 MCA.

This Court therefore concludes that Montana's statutory scheme for imposing the death penalty meets the standards established by the Gregg, Jurek, Proffitt and Woodson decisions. We further conclude the penalty is not cruel and unusual simply because Montana's criminal statutes allow its imposition in this case for the crime of aggravated kidnapping but not for the crime, as committed here, of deliberate homicide.

We turn now to defendant's contention that his counsel was not permitted to present arguments against imposition of the death penalty, contrary to the mandate of section 95-2206.7 now section 46-18-302 MCA, which states in pertinent part: "The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death." Defendant maintains because it appears from the record that the District Court had already determined the sentence prior to the July 10, 1978 date set for pronouncing sentence, defendant was denied the opportunity to present any arguments against the death penalty. This contention is without merit. The District Court issued an order dated June 2, 1978, clearly indicating a sentencing hearing was to be held on June 14, 1978, in accordance with sections 95-2206.6 through 95-2206.11, R.C.M. 1947, now sections 46-18-301 through -306 MCA. Those sections indicate what a sentencing court must consider in imposing the death penalty, including specifically that defendant or his counsel

be allowed to present argument against the death penalty.

Therefore by the June 2, 1978 order, the defendant and his counsel were on notice of the proposed content of that hearing. However, at the sentencing hearing, defendant did not present any evidence of mitigating circumstances other than the presentence report. No statement against the death penalty was made other than to suggest certain procedures to test its constitutional validity before it was in fact imposed. Defendant had his opportunity to speak and did not avail himself of it. Finally, the District Court order of July 31, 1978, denying defendant's petition for rehearing indicates the defendant also did not take advantage of the District Court's offer to accept proposed findings and conclusions from the parties with respect to the sentence. Thus defendant and his counsel had at least two opportunities to submit argument to the Court regarding the death penalty prior to the July 10, 1978 hearing, but did not do so.

We have determined thus far that defendant's conviction for aggravated kidnapping violated no constitutional prohibitions against double jeopardy, that the 1977 provisions for imposition of the death penalty are applicable to this defendant and furthermore are constitutional, and that this defendant was given an opportunity to present arguments against the death penalty. We come now to that part of this appeal which constitutes a review of the sentence received by defendant. In conducting this review, we will consider defendant's arguments regarding the proportionality of the penalty received in relation to other factors.

The decision in Gregg compels this Court to determine "whether the punishment of death is disproportionate in relation

to the crime for which it is imposed." Gregg, 428 U.S. at 187. In undertaking such a consideration, we are directed by section 95-2206.15, R.C.M. 1947, now section 46-18-310 MCA to consider whether the sentence was imposed as a result of passion, prejudice or other arbitrary factors; whether evidence supports the sentencing court's findings regarding aggravating and mitigating circumstances; and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. We make such an assessment based upon our independent review of the trial record and transcript, and of the record and transcript of the sentencing hearing. In so doing, we are not usurping the position of the District Court as the primary sentencing entity in Montana's system of criminal jurisprudence (see section 95-2212, R.C.M. 1947, now section 46-18-103 MCA); rather we mean to insure that a penalty as unique in its severity and as irrevocable as the death penalty is not wantonly and freakishly, or arbitrarily and capriciously imposed. See, Furman v. Georgia (1972), 408 U.S. 238, 309-310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Stewart, J. concurring); Gregg, 428 U.S. at 188-189.

Defendant has argued the sentence imposed here was a result of passion, prejudice or other arbitrary factors. We have considered defendant's arguments in this regard and determined that two warrant discussion. Defendant argues the sentences given to Robert Dennis Nank, defendant's accomplice in this crime, when compared to his own reflect the prejudice inherent in the sentencing. Nank, a white man, pled guilty to the offenses of deliberate homicide and solicitation to commit sexual intercourse without consent and received 100 year and 40 year sentences respectively. Defendant argues because he is black, his sentence of death for crimes

-30-

arising from the same incident as those of Nank's reflects obvious prejudice. We do not agree. Nank and this defendant received similar sentences for similar crimes namely, 100 years for deliberate homicide and 40 and 20 years respectively for the charges stemming from the act of sexual intercourse without consent. However, defendant was also found guilty of aggravated kidnapping, a charge finally dropped against Nank. It is for this crime the death penalty was imposed. Defendant is correct in his assertion the prosecution refused to accept his guilty plea to the same charges to which Nank had pled guilty. Defendant offered to plead guilty to the same charges to which Nank had pled guilty, however he insisted such plea must indicate he was innocent. The prosecution refused to accept this offer and we have previously held the refusal of a conditional offer not to be erroneous. State v. Coleman, 579 P.2d at 744-745. We do not find prejudice in defendant's sentencing simply because of the sentences his accomplice received.

Defendant has also argued his race was a factor operating to his prejudice with respect to the imposition of the death penalty. However defendant points to no evidence of this prejudice other than the fact of the sentence and the fact of his race. Defendant has speculated as to various possible factors evidencing such prejudice, but speculation is not sufficient to establish this claim. We have examined the sentence and determine it was not imposed as a result of passion, prejudice or other arbitrary factors, or because of his race.

Defendant contends there was evidence of mitigating factors present and the District Court did not give proper consideration to evidence when making its findings, conclusions, and when rendering judgment. The District Court is required by section 95-2206.10, R.C.M. 1947, now section 46-18-305 MCA to consider and compare aggravating and mitigating circumstances and can impose the death penalty only if there exists at least one

-31-

aggravating circumstance and no mitigating circumstances of sufficient substantiality to call for leniency. Section 95-2206.10, R.C.M. 1947, now section 46-18-305 MCA. This Court is required upon review of the sentence to determine whether there is evidence to support the District Court's findings and conclusions regarding aggravating and mitigating circumstances. Defendant admits the District Court properly found and concluded that the aggravating factor found in section 95-2206.8(7), R.C.M. 1947, now section 46-18-303(7), MCA (death of the victim of aggravated kidnapping) was present. What we now determine is whether the District Court was correct in its conclusion that there was no evidence of mitigating factors sufficiently substantial to call for leniency.

Defendant presented no evidence of mitigating circumstances at the sentencing hearing, though his counsel acknowledged the existence of the presentence investigation report. That report indicated the defendant had no record of criminal activity and had been an accepted member of the community where he lived prior to July 4, 1974, the date of the commission of this crime. The evidence in this case supporting the finding of the aggravating circumstance established that the defendant had been a deliberate, voluntary participant in the kidnapping and subsequent rape and murder of the victim. The evidence further established that the death of the victim occurred after a sexual assault, not in a moment of passion, but over a period of time with the defendant first bludgeoning, then attempting to strangle, then finally drowning the victim in an effort to effectuate a deliberate decision to kill Peggy Harstad. Against the record of this brutal crime, we cannot say that the defendant's lack of prior criminal activity of record is a factor sufficiently substantial to call for leniency. Moreover, the District Court did consider the mitigating circumstance of defendant's

-32-

lack of a criminal record but concluded this circumstance
was offset by evidence that defendant had committed a burglary
on the same day the kidnap, rape and homicide occurred.
Defendant has argued accomplice Nank's testimony, the source
of this evidence, was uncorroborated as to this fact.
However, Nank was sufficiently corroborated on other aspects
of his testimony and we have so held. Coleman, 579 P.2d at
748. Where an accomplice has been corroborated as to part
of his testimony and that testimony has been accepted as
truthful, it is proper for the court to infer the accomplice
spoke the truth as to all his testimony. State v. Phillips
(1953), 127 Mont. 381, 264 P.2d 1009, 1016; Territory v.
Corbett (1877), 3 Mont. 50; Roberts v. State (Okla.Crim.
1977), 571 P.2d 129, cert.den. 434 U.S. 957, 98 S.Ct. 485,
54 L.Ed.2d 316; People v. Blau (1956), 140 Cal.2d 193, 294
P.2d 1047; State v. Gross (1948), 31 Wash.2d 202, 196 P.2d
297; 22 C.J.S. Criminal Law, §812(2). See also, State v.
Jones (1933), 95 Mont. 317, 26 P.2d 341. We therefore
determine the District Court was correct in its conclusion.

We now must compare this sentence to those imposed in
similar cases to determine whether it was excessive or dis-
proportionate to those other sentences. Section 95-2206.15,
R.C.M. 1947, now section 46-18-310 MCA. As this is the
first time this Court has reviewed a sentence of death under
the new statutory scheme, we are obligated to define the
scope of our review when considering similar cases.

It is clear from the decision in Gregg that the purpose
of appellate review in a capital-sentencing system is to
serve as "a check against the random or arbitrary imposition
of the death penalty." 428 U.S. at 206. (Emphasis added.)
This review eliminates the possibility a death sentence will
be imposed by the action of an "aberrant" sentencing entity.

-33-

Gregg, supra.  The Georgia Supreme Court, construing language

identical to that in our own statutes, has stated in considering

similar cases:

> ". . . this court is not required to determine
> that less than a death sentence was never imposed
> in a case with some similar characteristics.  On
> the contrary, we view it to be our duty under the
> similarity standard to assure that no death
> sentence is affirmed unless in similar cases through-
> out the state the death penalty has been imposed
> generally and not 'wantonly and freakishly' imposed
> as stated by Justice Stewart in his concurring
> opinion in [Furman, supra]."  Moore v. State
> (1975), 233 Ga. 861, 213 S.E.2d 829, 832 (cited
> with approval in Gregg, 428 U.S. at 205).
> (Emphasis added.)

The emphasis in both Gregg and Moore is on the imposition of

the penalty, not upon the subsequent outcome of any appeal

from that imposition.  See also, Jarrell v. State (1975),

234 Ga. 410, 216 S.E.2d 258; Gregg v. State (1974), 233 Ga.

117, 210 S.E.2d 659.  Indeed, Georgia has indicated it will

consider cases where the penalty has been imposed by the

jury but vacated on appeal for reasons not material to the

sentence.  Stanley v. State (1977), 240 Ga. 341, 241 S.E.2d

173, 180.  Therefore, we conclude in fulfilling our duty to

compare "similar cases" we may include for comparison similar

cases where the sentence has been imposed by the District

Court, even though the sentence has been vacated on appeal.

Of course, such vacation must not have been predicated upon

the sentencing court's acting in a manner contrary to the

standards set forth in section 95-2206.15, R.C.M. 1947, now

section 46-18-310 MCA, nor have resulted in a complete

dismissal of the cause.  Furthermore, based upon Gregg, 428

U.S. at 204-206, and Proffitt, 428 U.S. at /258-259, we determine

we need not examine every similar case whether appealed or

not, rather we need only examine those cases where after

conviction the death penalty could have been or was imposed

that have reached our attention through the appellate process.

-34-

Because it is extremely rare that a defendant would acquiesce in a death sentence, we believe this procedure will insure we have a more than adequate representation of "similar cases." We will thus consider cases where the defendant has been charged with kidnapping and murder of the victim of the kidnapping and where the defendant has been charged with aggravated kidnapping where the victim has been killed.

A complicating factor in our review of similar cases is that the last hanging of a criminal defendant in Montana occurred in 1943. In the following quarter of a century, although several heinous murders occurred, the death penalty was assessed only a few times by District Courts. During that period the sentencing entity had unfettered and unguided discretion with respect to imposition of the death penalty. Judicial and legislative attitudes have changed, however, and in the last six to eight years, death penalty revisions have been enacted and such penalties imposed, spurred perhaps by the growing incidence of such serious crimes. Moreover, the crime of aggravated kidnapping has been a part of our statutory law only since 1973. Any review of cases earlier than this decade is virtually meaningless because the death penalty was not involved unless one goes far back into our state history. There are cases, however, though not large in number, to which we can look for a meaningful comparison.

The defendants in State v. Rhodes (1974), 164 Mont. 455, 524 P.2d 1095, were charged with and convicted of first-degree murder, kidnapping, and robbery. The defendants had escaped from jail in Idaho, kidnapped Donald Kalberg in Montana, who was later found shot to death near Forsyth, Montana, and were later apprehended in Tennessee after kidnapping one other person. The evidence was clear that the defendants

had committed the kidnapping and the "vicious, wanton, cold-blooded murder of Donald Kalberg." 524 P.2d at 1097. The District Court sentenced the defendants to death for the murder charge, and to the maximum penalty allowable for kidnapping, 10 years imprisonment. The sentence of the court for the murder charge was vacated by this Court as a result of the decision in Furman. It was not vacated for actions by the District Court contrary to the standards contained in section 95-2206.15, R.C.M. 1947, now section 46-18-310 MCA, nor were the charges dismissed by this Court. 524 P.2d at 1098.

The defendant in State v. McKenzie (1978), ____ Mont. ____, 581 P.2d 1205, 35 St.Rep. 759, was charged with deliberate homicide and aggravated kidnapping as a result of the bludgeoning death of Lana Harding. The District Court imposed the death penalty for both offenses and this Court affirmed following remand from the United States Supreme Court. 581 P.2d at 1235. The victim was found draped over a grain drill, partially nude, with a rope tied around her neck, and severely beaten about the head and body. 581 P.2d at 1210. Death had been caused by the severe blows.

These are the convictions that we can construe as "similar cases". We note that it is only since 1973 that the death penalty could be imposed for aggravated kidnapping where the victim has been killed. In the case of McKenzie, where that circumstance has occurred, the penalty has been invoked. We also note Montana is a sparsely populated state and crimes of such violent nature do not occur as frequently here as they do in more densely populated states. We conclude the penalty of death imposed against this defendant for the aggravated kidnapping of Peggy Harstad which resulted in her death, was not excessive or disproportionate to the

-36-

penalty imposed in similar cases in this state.

Defendant has argued that his sentence is dispro-
portionate and excessive when compared to the sentences
received by his accomplice, Robert Dennis Nank. We have
already distinguished the situations of these two persons
above. Nank was sentenced only for deliberate homicide and
solicitation to commit sexual intercourse without consent,
the charge of aggravating kidnapping having been dismissed
in return for his guilty plea and testimony at defendant's
trial. Therefore, defendant's sentence of death for aggravated
kidnapping is not excessive or disproportionate when compared
to the sentences received by Robert Dennis Nank. Leniency
in one case does not invalidate the death penalty in others.
Gregg, 428 U.S. at 199, 224-226.

We come to the final issue in this appeal: whether
upon review of the sentence imposed, this Court must reconsider
issues regarding the merits of the cause raised and disposed
of in the first Coleman appeal. We conclude we do not. Our
examination of the record to review the imposition of the
death penalty under the provisions of sections 95-2206.12 to
95-2206.15, R.C.M. 1947, now sections 46-18-307 to -310 MCA,
is not to reconsider determinations of merits already made,
but to determine whether in light of such determinations the
sentence has been equitably imposed. Our prior determination
of an issue constitutes a final adjudication of that issue.
Belgrade State Bank v. Swainson (1978), _____ Mont. _____,
578 P.2d 1166, 35 St.Rep. 113 (per curiam).

Defendant has argued the first Coleman decision as to
certain issues was conditioned upon finding the death penalty
invalid, thus a finding now that the penalty was validly
imposed necessitates a reconsideration of those issues. An

-37-

or disproportionate to the penalty imposed in similar cases in this state.

Defendant has argued that his sentence *is* disproportionate and excessive when compared to the sentences received by his accomplice, Robert Dennis Nank. We have already distinguished the situations of these two persons above. Nank was sentenced only for deliberate homicide and solicitation to commit sexual intercourse without consent, the charge of aggravating kidnapping having been dismissed in return for his guilty plea and testimony at defendant's trial. Therefore, defendant's sentence of death for aggravated kidnapping is not excessive or disproportionate when compared to the sentences received by Robert Dennis Nank. Leniency in one case does not invalidate the death penalty in others. Gregg, 428 U.S. at 199, 224-226.

We come to the final issue in this appeal: whether upon review of the sentence imposed, this Court must reconsider issues regarding the merits of the cause raised and disposed of in the first Coleman appeal. We conclude we do not. Our examination of the record to review the imposition of the death penalty under the provisions of sections 95-2206.12 to 95-2206.15, R.C.M. 1947, now sections 46-18-307 to -310 MCA, is not to reconsider determinations of merits already made, but to determine whether in light of such determinations the sentence has been equitably imposed. Our prior determination of an issue constitutes a final adjudication of that issue. Belgrade State Bank v. Swainson (1978), _____ Mont. _____, 578 P.2d 1166, 35 St.Rep. 113 (per curiam).

Defendant has argued the first Coleman decision as to certain issues was conditioned upon finding the death penalty invalid, thus a finding now that the penalty was validly imposed necessitates a reconsideration of those issues. An

-37-

examination of the first Coleman opinion reveals the holdings of this Court which defendant alleges were dependent upon finding the death penalty constitutionally invalid, were made clearly without such dependency. Coleman, 579 P.2d at 745, 749, 752.

Judgment of the District Court is affirmed, except that the cause is remanded to the District Court for the purpose of resetting the execution date of the defendant, Dewey Eugene Coleman; said execution to be supervised by the sheriff of the county where he was tried. Section 46-19-103(3) MCA. If defendant or defendant's counsel should wish, he may submit a list of any other similar Montana cases that he may request us to review for comparative purposes, within the time provided for and as a part of any petition for rehearing in this cause.

_____
John C. Sheehy
Justice

We Concur:

_____
Frank I. Haswell
Chief Justice

_____
John Conway Harrison

_____
Gene B. Daly
Justices

Mr. Justice Daniel J. Shea will file his dissent later.

-38-

No. 14448

------------------------------------------------------------

STATE OF MONTANA,

     Plaintiff and respondent,

  vs.

DEWEY EUGENE COLEMAN,

     Defendant and appellant.


------------------------------------------------------------


DISSENT OF MR. JUSTICE DANIEL J. SHEA

FILED

JUL 11 1979

*Thomas J. Kearney*

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

I would refuse to allow the death penalty to be imposed. In its first decision, this Court clearly indicated that the death penalty was not to be considered at the resentencing. This Court, moreover, has reached unfairly into application of retroactive statutes to permit the death penalty to again be imposed. Finally, assuming arguendo that the sentencing court could properly apply the 1977 death penalty statutes to the 1974 crimes, it did not properly apply the law, nor did this Court properly perform its mandatory review duties under the 1977 statutes.

After defendant had entered his pleas of not guilty to count I (deliberate homicide), count II (aggravated kidnapping), and count III (sexual intercourse without consent), the court, of its own motion amended the aggravated kidnapping charge by adding the following language: "the alleged actions of the defendant resulted in the death of Peggy Lee Harstad." Defendant objected to such amendment, but to no avail.

The case was then tried and submitted to the jury on all three counts, and the jury was given general verdict forms on each count. But the trial court, because of its own amendment of count II, also submitted a special verdict or special interrogatory to the jury asking it if the aggravated kidnapping "resulted in the death of Peggy Lee Harstad." The jury, in addition to returning guilty verdicts on all three counts, answered the special interrogatory in the affirmative that the aggravated kidnapping "resulted in the death of Peggy Lee Harstad." Defendant also had objected to the submission of the special interrogatory to the jury.

In the first Coleman appeal, this Court ruled against the defendant on both issues. As to the trial court's amendment

-39-

of count II, after defendant's plea, and over defendant's objection, this Court held that the amendment was one of form rather than substance because defendant was at all times aware that the State was seeking the death penalty. (Coleman, 579 P.2d at 732) However, this Court then stated the crux of its holding in relation to the amended information:

> "In any event, no legal prejudice resulted from the amendment of count II in the light of our holding that Montana's death penalty statute as it existed in 1975 is unconstitutional." 579 P.2d at 746.

This language clearly indicates that this Court did not believe that upon the case being remanded to the District Court for resentencing that the death penalty would be reimposed by applying the 1977 statutes to the 1974 crimes.

Moreover, the language of this Court's opinion in the first Coleman appeal concerning the submission of the special interrogatory to the jury leads to the same conclusion. This Court ruled that the submission of the special interrogatory to the jury did not undermine the general verdicts also submitted to the jury. 579 P.2d at 751. But again, the crux of this Court's holding on this issue, is stated as follows:

> "In any event, our holding on Montana's death penalty statutes renders this specification of error nonprejudicial." 759 P.2d at 751.

These holdings on the questions of the amended information and submission of the special interrogatory to the jury, are a clear indication that this Court did not believe that defendant would be subject to the death penalty upon his resentencing. These holdings, moreover, are a clear directive to the District Court that capital punishment was to be eliminated from its consideration. But, of course, it was the desire of the District Court to inflict the death penalty if there was any way possible, and therefore it chose to interpret this decision otherwise.

-40-

In its findings, conclusions, judgment, and order of death, dated July 14, 1978, the District Court summarized what it considered to be the essence of this Court's holding in overturning the first death sentence. (I note parenthetically, that its summary was a foregone conclusion, for on June 2, 1978, the same day as the remittitur of this Court arrived at the District Court, it sent out an order to counsel for both sides that sentencing could be carried out pursuant to the 1977 death penalty statutes.) In any event its legal position is revealing:

> ". . . The Court limited its decision on overturning the death penalty to the absence of procedural requirements allowing the trial court to consider any mitigating circumstances in its imposition of a penalty under the unconstitutional death penalty statute.. . .

> ". . .

> ". . . The statute as amended was declared unconstitutional in this case, but the Supreme Court in remanding for resentencing did not specifically declare if the trial court could or could not impose the death penalty. Coleman argues that since the mandatory statute was declared unconstitutional, Coleman cannot be sentenced to death under laws enacted after his conviction. (Emphasis added.)

> "The Supreme Court at page 11 of its opinion indicates that if the death penalty had been imposed under proper procedural safeguards, the sentence would have been upheld. The Court states:

> "'To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures. (Citations.) None of these required procedures are present in Montana's death penalty statute as it existed in 1975, nor were they provided otherwise in this case. (Emphasis added.) Thus defendant's death sentence cannot stand.' (Emphasis is the trial court's.)

> "The emphasized language strongly suggests that if the sentencing court had observed procedural requirements declared by recent U.S. Supreme Court decisions, the death penalty would have been upheld notwithstanding that Montana's mandatory law was unconstitutional. (Emphasis added.)

> "The later enactment of sections 95-2206.6, et seq., spelling out the procedure, should not operate to

> take away the court's power to impose the death
> penalty under proper procedural safeguards.
> The death penalty is an operative fact under the
> Montana Constitution and section 95-5-303, R.C.M.
> 1947, and are not to be ignored because a procedurally
> effective statute is abrogated and other statutes
> are substituted therefor. As argued by the State
> from the Dobbert case, the circumstance that the
> defendant is afforded greater procedural protection
> by the trial court's utilization of sections 95-
> 2206.6, et seq., does not fall within the prohibition
> of ex post facto laws.

> "In summary, the trial court in now pronouncing
> sentence is in a position to utilize the interim
> developments in sentencing procedure as reflected
> in recent U.S. Supreme Court decisions and the
> Montana statutes enacted in response thereto."

The court then listed its findings and conclusions and entered its order sentencing defendant to death for the second time.

The sentencing court obviously milked the majority decision as much as it could in order to arrive at a decision that would allow a reconsideration of the death penalty. True, this Court did not explicitly direct the District Court to eliminate the death penalty from its consideration. But a fair reading of our decision on the questions of the amended information and the special jury interrogatory leads to that conclusion.

The sentencing court concludes its original death penalty would have been approved if only it had the foresight to allow the defendant to present mitigating circumstances at a presentence hearing. Not only is this a misreading of the opinion by the District Court, but it is clear that such procedure would not have been approved. For the statutes themselves must provide for the presentencing hearing permitting evidence of aggravation and mitigation. As I covered the statutory requirements in my dissent in State v. McKenzie (1978), ____ Mont. ____, 587 P.2d 1205, 1266-1277, 35 St.Rep. 759, it would serve no useful purpose to again set forth these requirements as mandated by the United States Supreme Court. It is sufficient to say that the District Court is sadly mistaken.

-42-

It is equally clear that the trial court was interested only in applying Dobbert to the facts of this case and that it did not consider either the ex post facto provision in the Montana Constitution, or the statutory directive of section 12-201, R.C.M. 1947, which prohibits any retroactive application of a statute unless it is specifically provided for in the statute. I must admit, however, that I am even more amazed by the majority's application of these laws to the facts of this case. It is a clear demonstration of what can happen when the law is not allowed to get in the way of the result.

It is unfortunate indeed that the majority has chosen to join lock step with the United States Supreme Court, and not only in interpreting the United States Constitution. The only reference the majority makes to the ex post facto provision of our own Constitution is where it sets forth the issue raised by the defendant:

"The next issue with which we are confronted is whether ex post facto provisions in the federal and state constitutions or the statutorily codified rule of construction against retroactivity (section 12-201, R.C.M. 1947, now section 1-2-109 MCA) prevent application of the sentencing statutes enacted in 1977 to this defendant. . ." (No. 14448, State v. Coleman, decided 6/20/1979.)

The statement of the issue in this way constitutes a forewarning that all issues are going to be decided by one standard --the standard set forth by the United States Supreme Court in Dobbert v. Florida (1977), 422 U.S. 282, 92 S.Ct. 2290, 53 L.Ed.2d 344. Why this Court consistently refuses to give more substantive meaning and protection to our own constitutional provisions as opposed to that given by the United States Constitution, I cannot understand. The United States Supreme Court is not the sole repository of all wisdom. Nor can it be the final authority on the interpretation of the Montana Constitution.

-43-

Though we must accord all people every right to which they are entitled under the United States Constitution, there is nothing which prevents us from according them even more fundamental protection under our own Constitution. Article II, Section 21, 1972 Montana Constitution provides:

"No ex post facto law nor any law impairing the obligations of contracts, or making any irrevocable grant of special privileges, franchises, or immunities, shall be passed by the legislature." (Emphasis added.)

Under this provision, I would hold that no law passed by the legislature after the commission of the crime, whether denominated substantive or merely procedural or ameliorative can be applied to permit a sentence of death, if the statutes applicable at the time of the commission of the crimes, were constitutionally deficient, and hence would not permit the imposition of the death penalty. The frailties of mankind (and judges must be included in this reference) are such that a man's life should not be subject to the hair-splitting mischief inherent in interpreting a retroactive application of the law.

In the first Coleman decision, we declared the provision calling for mandatory execution in the event of a conviction of the crime of aggravated kidnapping leading to the victim's death, to be unconstitutional. 579 P.2d at 741-742. Under the statutes then existing, defendant could not constitutionally be sentenced to death. For this reason, I would declare that the 1977 death penalty statutes (however they be denominated-- substantive, procedural, ameliorative, or whatever) could not constitutionally be applied to defendant. Accordingly, the trial court had no authority to again sentence defendant to death.

Nor do I believe that there is any excuse of the majority's failure to give the defendant the benefit of a doubt in inter- preting section 12-201, R.C.M. 1947 (now section 1-2-109 MCA).

-44-

That section falls within the chapter containing the rules of construction which are to apply to <u>all</u> statutes in the State of Montana. Section 12-201 provides:

> "No <u>law</u> contained in <u>any</u> of the codes or other statutes in Montana is retroactive <u>unless</u> <u>expressly</u> <u>so</u> <u>declared</u>." (Emphasis added.)

The only reasonable interpretation of this statute is that the 1977 death penalty statutes can apply to the defendant only if the legislature expressly declared that these statutes were to have retroactive effect. Not only is there a total lack of express declaration that the 1977 death penalty statutes are to be retroactively applied, but there is no room even to imply that the legislature intended them to have a retroactive effect. (See sections 95-2206.6 through 95-2206.15, R.C.M. 1947, now sections 46-18-301 through 46-18-310 MCA). The statutes contain no directive for retroactive application.

This statute prohibiting retroactive application of legislative acts does not distinguish between retroactive application of a procedural statute or retroactive application of a statute that is considered substantive. It prohibits retroactive application of <u>any</u> statute--period--unless it is "expressly declared" to have retroactive application. This hair-splitting business of distinguishing between a substantive law and a procedural law must stop when a man's life literally hangs in the balance.

This Court has also ignored fundamental case law previously adopted by this Court in interpreting section 12-201. Because it is a rule of construction which applies to all statutes enacted by the legislature, it will not be given retroactive effect unless expressly so declared. State ex rel. Whitlock v. State Board of Equalization (1935), 100 Mont. 72, 84, 45

-45-

P.2d 684.  This holding does nothing more than to give full meaning to the express language of section 12-201.  This Court also held that statutes are intended to operate prospectively only, in the absence of a contrary intention clearly expressed in the statutes, and that every reasonable doubt is resolved against a retroactive application of a statute.  State ex rel. Mills v. Dixon (1923), 68 Mont. 526, 528, 219 P. 637.

The death penalty statutes enacted in 1977 were not expressly declared by the legislature to be retroactive in application.  The statutes are silent.  It is presumed therefore, that they were intended to operate only prospectively.  Other than an emasculation of the law there is no way that this Court should have declared them, in essence by judicial fiat, to operate retroactively.  Section 12-201 prohibits such inter-pretation; Whitlock, supra, solidifies this statute; and Dixon, supra, clearly establishes that every reasonable doubt should be resolved against retroactive application of a statute.  If there are not legitimate policy reasons in a death penalty case to resolve a reasonable doubt against retroactive application in order to save a man's life, I cannot conceive of another instance where such policy reasons would exist.  By suspending the operation and effect of section 12-201, this Court has inflicted a grave injustice upon the defendant--one that can never be rectified.

There is, moreover, another statute which this Court, as well as the trial court, totally ignored in reaching its decision.  Section 43-507, R.C.M. 1947 (now section 1-2-201(1) MCA) provides:

> "Every statute, unless a different time is
> prescribed therein, takes effect on the first
> day of July of the year of its passage and
> approval."

-46-

The death penalty statutes (sections 95-2206.6 through 95-2206.15) provide no time as an effective date. Accordingly, they were effective as of July 1, 1977. Though the majority ignored this statute, it does appear that somehow they would have avoided its application to the defendant's case. But, at least they owed the defendant an explanation.

Conceding arguendo that it was proper to apply the 1977 death penalty statutes to the 1974 crimes, it is still abundantly clear that the trial court failed to follow the statutes, and that this Court failed to fulfill its statutory functions under the mandatory review provisions of the statutes. For these reasons also, the death penalty should not be allowed to stand.

To place this second sentencing in proper perspective with the first sentencing, I digress to the circumstances surrounding the first trial insofar as they are pertinent to the imposition of the first death sentence.

The aggravated kidnapping statutes called for the mandatory infliction of the death penalty if the victim died as a result of the kidnapping. (Sections 94-5-303, and 94-5-304, R.C.M. 1947.) Originally the State did not allege in Count II of the information (the aggravated kidnapping charge) that the victim died as a result of the kidnapping. But after the defendant had entered his plea, and over defendant's objection, the trial court, on its own motion, amended count II to allege also that the victim died as a result of the kidnapping. As so often is the case, this Court does not know why the trial court did this, but it appears that it believed that the lack of this allegation would be fatal to the imposition of a death penalty if defendant was convicted of aggravated kidnapping. The trial court followed up this allegation by submitting a special interrogatory to the jury, asking it to determine whether

-47-

or not the victim died as a result of the kidnapping. In addition to returning a general verdict of guilty to the charge of aggravated kidnapping, the jury answered the special interrogatory in the affirmative--that is, that the victim did die as a result of the kidnapping. The stage was then set for the imposition of the mandatory death penalty.

Based on the amended information and the jury's answer to the special interrogatory, the trial court, without ordering a presentence investigation, and without holding a presentence hearing to permit presentation of evidence as to aggravation and mitigation, sentenced the defendant to death. I add here that the then existing statutes did not require a presentence investigation or a presentence hearing. Indeed, it would have been useless to do so, because the statutes required the imposition of the death penalty, and pursuant to the amended information and the jury's answer to the special interrogatory, all that remained was for the court to impose the required death penalty. It was this imposition of the mandatory death sentence that this Court declared unconstitutional in the first Coleman appeal. 579 P.2d at 741-742.

It is fair to say that the extraordinary activities of the trial court in amending the information and in submitting the special interrogatory to the jury, suggest at a minimum that he had more than an ordinary interest in setting the stage for the eventual imposition of the death penalty in the event of a conviction on the count of aggravated kidnapping. This then, was the state of mind of the sentencing judge as he again prepared to sentence the defendant after the first Coleman appeal.

It is revealing to set forth the background of how the sentencing judge set up the second imposition of the death penalty for the defendant. This Court decided the first

-48-

Coleman case on April 26, 1978, and the petition for rehearing was not turned down until May 30, 1978. But in the meantime, the sentencing court was active. On May 2, 1978, he entered an order (with copies sent to all counsel of record) that defendant was to be immediately returned to the Custer County jail and held there pending presentencing investigation and sentencing. The sentencing/judge simply did not bother to wait until the case had been returned to him after the denial of defendant's petition for rehearing.

On June 2, 1978, the presentence investigation report was submitted to the court with the notation in the report that the sentencing judge "is still awaiting some type of legal papers from the Supreme Court and that sentencing will not be set until such papers arrive."

Apparently the papers arrived that same day, for on June 2, 1978, the sentencing court sent out an order to all counsel of record that the sentencing hearing would take place on June 14, 1978 in the Custer County Courthouse, and that the hearing would be conducted "in accordance with Sec. 95-2066.6 through 95-2206.11 R.C.M. 1947, as amended" (the 1977 death penalty statutes). It appears from this that the prosecution had kept the sentencing judge well abreast of the developing law from the United States Supreme Court, namely, Dobbert v. Florida (1977), 432 U.S. 282, 92 S.Ct. 2290, 53 L.Ed.2d 344. I have previously discussed in this dissent the point that the trial court ignored the ex post facto provision in the Montana Constitution, and section 12-201 of our statutes.

With the decision of the sentencing court from the inception that it would apply the 1977 death penalty statutes, we are now in a position to examine those statutes, sections 95-2206.6 through 95-2206.15, R.C.M. 1947, now sections 46-18-301 through 46-18-310 MCA) and sections 94-5-102 and 94-5-303

-49-

(now sections 45-5-102 and 45-5-303 MCA).

Under the 1977 statutes, sections 95-2206.6, provides that if there is a conviction in which the death penalty may potentially be imposed, the sentencing judge must conduct a mandatory presentence hearing to determine if any statutory aggravating circumstances exist under section 95-2206.8 and if any statutory mitigating circumstances exist under section 95-2206.9. The scope of the hearing is set forth in section 95-2206.7:

> "Sentencing hearing--evidence that may be received. In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death."

I note in this respect, and I will develop this point later, that an evidentiary hearing did not in fact take place. The State presented no evidence in aggravation, apparently content that the sentencing court would later find that the victim died as a result of the kidnapping. But neither did the defendant present any evidence. He did not take the witness stand, nor did anyone else in his behalf, nor was any documentary evidence presented in his behalf. Other than the trial transcript, the only sentencing background the court had was contained in the presentence investigation report.

The statutory aggravating circumstances are set forth in section 95-2206.8:

> "Aggravating circumstances. Aggravating circumstances are any of the following:

-50-

"(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

"(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

"(3) The offense was deliberate homicide and was committed by means of torture.

"(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

"(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

"(6) The offense was deliberate as defined in subsection (1)(a) of 94-5-102 and the victim was a peace officer killed while performing his duty.

"(7) The offense was aggravated kidnapping which resulted in the death of the victim." (Emphasis added.)

For purposes of this case only, subsection (7) (which is emphasized) is important. In specific written findings of fact as to subsections (1) through (6) the sentencing court properly found that the aggravating circumstance did not apply to the facts of this case.

The statutory mitigating circumstances are set forth in section 95-2206.9:

"Mitigating circumstances. Mitigating circumstances are any of the following:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(3) The defendant acted under extreme duress or under the substantial domination of another person.

"(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(5) The victim was a participant in the defendant's conduct or consented to the act.

-51-

"(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

"(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

"(8) Any other fact exists in mitigation of the penalty." (Emphasis added.)

For purposes of this case only subsections (1) and (8) (both emphasized) are important. The trial court properly found an absence of mitigating circumstances listed in subsections (2) through (7) and entered specific findings as to each negating the existence of the mitigating circumstance. But as I will later develop, the sentencing court totally misapplied the law in relation to subsection (1), and failed to negate the existence of "any other fact exists in mitigation of the penalty" as provided for in subsection (8).

Explicit findings as to the existence or nonexistence of aggravating circumstances or mitigating circumstances, are mandated by section 95-2206.11:

"Specific written findings of fact. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 95-2206.8 and 95-2206.9. The written findings of fact shall be substantiated by the records of the trial and the sentencing proceeding." (Emphasis added.)

The statute supposedly enacted to guide the sentencing court in its decision as to whether or not to impose the death penalty, section 95-2206.10 provides:

"Consideration of aggravating and mitigating factors in determining sentence. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 95-2206.8 and 95-2206.9 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 95-2206.8 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense." (Emphasis added.)

-52-

Under this statute, a death penalty cannot be imposed unless there is at least one aggravating factor. But if there is at least one such aggravating factor, it does not require the sentencing court to give any weight at all to mitigating factors. Rather, the sentencing court, in its infinite wisdom, and untrammeled discretion, is permitted to sentence to death if he finds at least one aggravating factor and a thousand mitigating factors. All he must state is that the mitigating factors are "not sufficiently substantial to call for leniency." Under this statute, a defendant is totally at the mercy of the sentencing court as to what weight, if any, it chooses to give to mitigating factors. The only factors which may save a defendant from the death penalty are the identity of the sentencing judge and his personal attitude about whether or not he should impose the death penalty. This is worse than a game of Russion roulette for the defendant does not even get a chance to turn the cylinder to see which judge he draws.

In any event, the above is the statutory scheme under which the judge entered his findings, conclusions, order and judgment, on July 10, 1978. But before discussing his findings, conclusions, order and judgment, the facts surrounding the commission of the crimes are important for several reasons, but primarily for the reason that they show the deep involvement of defendant's accomplice, Robert Dennis Nank, in every facet of the crimes, and yet Nank has avoided the death penalty. The facts I state here are taken from the presentence report filed on June 2, 1978, which were in turn taken from the State's brief on appeal, filed November 17, 1977, with this Court. I quote verbatim from the presentence investigation report:

> "On July 4, 1974 he and Dewey Coleman were sitting in a park in Roundup, Montana. They were destitute financially and made a decision to burglarize a home in Roundup where they sold several rifles,

and, at the Roundup airport buried the same. [As I will later demonstrate, the trial court improperly relied on this in sentencing Coleman to death.] They decided that, because they were destitute financially and low on gas for the motorcycle on which they were traveling, it would be necessary for them to burglarize someone else and to kill them to destroy the evidence. As they proceeded east from Roundup to Forsyth, Nank's motorcycle ran out of gas approximately five miles west of Vananda, Montana. They attempted hitchhiking, but were refused by an elderly couple who stopped to determine what was the matter. This occurred about 10:00 o'clock P.M. Shortly thereafter, Miss Harstad offered the pair a ride and continued easterly down U.S. 12. At a location about nine miles west of Forsyth where Nank, sitting next to Miss Harstad, turned off the key for the ignition and steered the car to a stop. Nank held the girl while Dewey Coleman drove the vehicle back to their motorcycle which was out of gas. They picked up their motorcycle helmets and a rope used to tie luggage to the motorcycle and again proceeded east down U.S. 12. North of Vananda, about a half mile from the highway, the two attempted sexual intercourse with Miss Harstad. Despite her pleas Coleman had intercourse with her. She was in menstruation at the time. Nank also attempted intercourse, but failed because of a lack of penal erection. Nank did assist in holding Miss Harstad while Coleman had intercourse and also gratified his desire to stroke Miss Harstad's feet. Following sexual intercourse they tied Miss Harstad with a rope and traveled in her vehicle with her through Forsyth to Rosebud, Montana and returned west from Rosebud to Forsyth. West of Forsyth they crossed a bridge over the Yellowstone River and proceeded again east down a dead end road on the north side of the river. Nank carried the girl, now clothed, from the car towards an abandoned Milwaukee Railroad Depot and across the railroad tracks. While Nank held the girl over his shoulder, Coleman came from behind swinging his silver motorcycle helmet by the chin strap and crashed it against Miss Harstad's skull. Nank dropped her to the ground and Coleman proceeded to hit Miss Harstad several more times with the helmet. Since she was not dead, the two attempted to strangle her with a rope. Then Coleman alone attempted strangulation. Thinking she was dead, the two carried her down the embankment in a seclusion of trees and heavy brush and threw her into a puddle of water which was caused by the overflowing Yellowstone River. However, the young lady had not expired and she stood up in the water. At this point, both Nank and Coleman went into the water. Coleman held her lower body and Nank held her head under water until she was drowned." (Emphasis added.)

-54-

So far as the record is concerned, it is from these facts only that the sentencing court again imposed the death sentence. The findings and conclusions are devoid of any other factors which entered into the decision of the sentencing court.

What did happen at the June 14, 1978 sentencing hearing? The State presented no evidence in aggravation; and the defendant did not testify himself or present other testimony, or present documentary evidence. The prosecution tried unsuccessfully to call the defendant to the witness stand. Before the conclusion of the proceedings on that day, however, the presentence investigation report was formally filed by the sentencing court and made an official part of the record. Each party was given an opportunity to examine the parole and probation officer who prepared the report, but each declined. The prosecuting attorney formally declared that, "I have read the report and I don't have any objection to any of the material in the report."

During this hearing, the court commented on one portion of the presentence investigation report in relation to defendant's criminal background, and I will later develop the importance of this comment in relation to the eventual findings of the sentencing court:

> ". . . The significant part of it [the presentence investigation report] relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge." (Emphasis added.)

Being that neither party presented any formal evidence, it was also agreed that the parties would present to the court through their briefs what they considered to be aggravating and mitigating circumstances, respectively. It appeared that the prosecutor would also present proposed findings and conclusions,

-55-

but that the defendant did not indicate whether or not he would present proposed findings and conclusions. There is no question, however, that he knew he was given the right to do so. The June 14, 1978 presentencing hearing was then adjourned. The next time the parties would again meet in court was July 10, 1978 when the sentencing judge came to court with his sentence of death in hand.

This Court does not have the briefs that were exchanged between the parties and the court from the time of the June 14, 1978 presentence hearing and the date set for the sentencing. Nor do we have the proposed findings and conclusions submitted to the court by the prosecutor.

On July 10, 1978, the judge came to court with findings, conclusions, judgment, and order of execution, already prepared. As a formality, however, the sentencing court permitted defense counsel (and the prosecutor) to make final arguments against and for the death penalty. Insofar as the defendant is concerned, this situation can be likened to permitting final arguments to a jury only after the jury has returned with its verdict. Defense counsel did ask the sentencing court to consider matters contained in the presentence investigation report, including the fact that defendant did not have a previous criminal record before the particular crimes here, and that the crimes committed were totally inconsistent with his previous behavior as established by residents in Great Falls, Montana, who had known defendant for some time. He also asked the court for leniency because Nank, who was an admitted accomplice of the defendant, had committed exactly the same crimes as defendant, but through plea bargaining and turning state's evidence, was not given the death penalty. He also argued that defendant was not being treated equally by either the prosecutor or the court because

he was black, and argued that the judge's orchestration of certain matters during the first trial showed his prejudice. Moreover, defendant again maintained his innocence of the crimes.

It was clear that the clean record of the defendant before the crimes involved here, bothered the sentencing court. Not that the court wanted to show leniency because of the clean record, but that the court did not know how to handle the matter. Eventually, the court rationalized defendant's situation to the fact that he had just never been convicted of any previous felony:

> ". . . The one mitigating circumstance is that the defendant has not prior to this time been convicted of a felony, but in view of the enormity of the crime committed, and the Court's feeling that this one circumstance does not overcome the aggravated circumstances, I have made findings to this effect, written findings as required by law. Also I have made conclusions and judgment which have been furnished to the defendant and the state at this time, and I will only at this time read the Court's conclusions and judgment . . ." (Emphasis added.)

After the sentencing court made this statement, it stated for the record that it would not read its written findings into the record, but would simply read its conclusions and judgment into the record--whereupon defendant was sentenced to death. Before appealing to this Court, defendant petitioned the sentencing court for a reconsideration of the sentence, but was turned down. Automatic appeal to this Court followed, pursuant to the provisions of sections 95-2206.12 through 95-2206.15 (now sections 46-18-307 through 46-18-310 MCA).

Before discussing some of the crucial issues relating to the sentencing itself, the trial court's memorandum in justification of turning down defendant's petition for reconsideration, is revealing. In this petition, defendant contended, among other things that: defendant had a right to present argument to the

-57-

sentencing court before the sentence of death, and that this right was denied because the court already had its order of execution prepared when the court formalistically allowed defendant's counsel to make his arguments; the sentencing court had failed to take the presentence investigation report into account; the sentencing court had in essence found defendant guilty of previous criminal conduct by relying on the uncorroborated testimony of Nank that he and defendant had burglarized a home in Roundup, Montana, and stole some rifles, on the same day as the crimes involved here; and that the sentencing court totally failed to consider the favorable treatment given to Nank who had admitted the same crimes for which defendant stood convicted.

In its July 31, 1978 order denying the petition for reconsideration of the sentence, the trial court failed to mention any of these arguments, and seemed to ground its order on its conclusion that defendant was merely rehashing old arguments already presented. But the order is revealing for what it says about mitigating circumstances:

> "A pre-sentence hearing was conducted on June 14, 1978, at which time defendant and his counsel were given an opportunity to present any matter in mitigation, but defendant declined to take the witness stand and failed to otherwise present any evidence in mitigation.

> ". . .

> "The court then prepared its findings and conclusions based upon the aggravating and mitigating circumstances known to the court. A day for sentencing was then set, at which time counsel for defendant gave a discourse on matters previously presented by brief to the trial court on the motion to quash, and to the Supreme Court on the appeal.

> ". . .

> "Coleman at the sentencing hearing was given the opportunity to present any mitigating circumstances he might choose, but declined to do so, which distinguishes Lockett from the instant case. Other

-58-

than the mention of the Lockett case, the final
oral argument of defendant's counsel and the
petition for rehearing raise no new matter not
previously considered by the court at the time
of the preparation of the trial's court's findings
and conclusions.

"Now, Therefore, It Is Ordered that the petition
for rehearing be denied." (Emphasis added.)

The undeniable fact is that other than the circumstances

of the crimes as divulged by the trial itself, the only informa-

tion of record that the sentencing court had before it sentenced

defendant to death, was the presentence investigation report.

But, the sentencing court totally ignored this report, with

the exception of the defendant's criminal background.

The presentence investigation report contained the following

subject headings: (a) Criminal History; (b) Official Version

of Crime and Defendant's Version of Crime; (c) Physical

Description and Condition (of the defendant--this section

includes references to several psychological tests and profiles

of the defendant; (d) Family and Social Background; (e)

Educational and Vocational History; (f) Marital History;

(g) Military History; (h) Summary and Conclusion. A sentence

of death is immediately suspect when the findings in support

of that sentence are entirely devoid of any considerations

other than the circumstances of the commission of the crime

itself. Not once did the sentencing court refer to the

defendant's history or background. It is almost like the

sentencing court entered an order for the extermination of

an inanimate object, certainly not a living, breathing human

being.

Since the sentencing court and the majority opinion

provide no facts as to defendant's background, I believe it

is imperative to do so. I take this background from the only

source there is of record, the presentence investigation report.

-59-

Dewey Coleman is a black man, born October 26, 1946, in Missouri, the son of a boilermaker and a housewife. There were nine brothers and sisters in his family. At the age of fourteen, he ran away from home, but some time later he returned to Missouri. He graduated from high school in 1964. His father died in 1964 and his mother died in 1972. As of January 20, 1975, only four brothers and sisters were known by him to be alive. He apparently has had no contact with his family since that time.

From 1965 to 1972, he was in the United States Navy. He was discharged in 1969 but was recalled to active duty very shortly thereafter. He attained the rank of E-5 and was primarily involved in doing clerical work. During this time he also received approximately two years of education at a junior college and through correspondence courses. He received his discharge from the Navy in 1973 and apparently is on disabled classification as a result of a service-connected activity.

In 1973, he came to Great Falls, Montana, in part because he wanted to remove himself from the drug scene. He had used drugs on and off since the young age of 12 or 13 when he and his friends smoked marijuana that was growing wild near his home in Missouri. He later became involved with using cocaine, amphetamines and heroine.

Upon his arrival in Great Falls, Montana, he became actively involved with Opportunity Incorporated, a community action low income coalition of individuals who worked for welfare rights and the betterment of low income people. While associated with Opportunity Incorporated he became founder and president of L.I.N.C. (Low Income Neighbors Coalition). He helped organize a Christmas program for low income youngsters in the

-60-

Great Falls area, and provided the time and initiative to get several projects developed before he left in May 1974 for the Veteran's Hospital in Sheridan, Wyoming.

Insofar as can be determined, defendant had never been convicted of even a misdemeanor charge. Indeed, he had not even been arrested for any offense. The parole and probation officer spoke with several individuals in Great Falls concerning Coleman, and he stated in his report:

> "This writer spoke with several individuals associated with the subject and familiar with his work in the Great Falls area and everyone that I talked with was complimentary of this individual's work and viewed with some disbelief the crime this individual has committed."

After his arrest, several persons performed psychological testing of defendant, and their diagnoses ranged from such determinations as paranoid schizophrenia; schizodal personality; organic brain syndrome; depressive reaction; a patient with passive-aggressive personality; aggressive personality disorders; and depressive reaction with anxiety (Depressive Neurosis).

Although the above is not a complete profile of the defendant, I have provided some background so that it can be shown that the findings of the sentencing court are barren of any considerations of defendant's personal circumstances. The findings which were made are meaningless to a reviewing court. We cannot guess at how the sentencing court evaluated defendant's individual circumstances. The United States Constitution will not permit us to guess.

After Furman v. Georgia (1972), 96 S.Ct. 2726, 408 U.S. 184, 33 L.Ed.2d 346 was decided, a great many states responded to this decision by enacting mandatory death penalty statutes. The 1973 Montana/ statutes allowed a consideration of mitigating circumstances, but the 1974/ statutes eliminated a consideration of mitigating circumstances, thereby making the death penalty mandatory in

certain situations specified in the statutes. However, the
United States Supreme later decided in a series of cases that
mandatory death penalties are unconstitutional. Woodson v.
North Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.
2d 944; Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861,
53 L.Ed.2d 982; and Roberts v. Louisiana (1977), 431 U.S.
633, 97 S.Ct. 1993, 52 L.Ed.2d 637. It was on the basis of
these cases that this Court in the first Coleman case declared
Montana's mandatory death penalty statute to be unconstitutional.
State v. Coleman (1978), _____ Mont. _____, 579 P.2d 732, 741-
742.

What the Court stated in Woodson, applies, of course, to
this case:

> ". . . respect for humanity underlying the
> Eighth Amendment requires consideration of the
> character and record of the individual offender
> . . . as a constitutionally indispensable part
> of the process of inflicting the penalty of death."
> Woodson v. North Carolina, 428 U.S. at 304.

By the time this Court had declared the 1974 death
penalty statutes unconstitutional (1978), the legislature in
1977 had already enacted new death penalty statutes in response
to Woodson, Coker and Roberts, and in response to Gregg v.
Georgia (1976), 428 U.S. 153, 96 S.Ct. ~~2209~~ *2909* 49 L.Ed.2d 859;
Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d
929, and Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct.
2960, 49 L.Ed.2d 913. In Gregg, the court held that the
decision to impose the death penalty must be:

> "guided by standards so that the sentencing
> authority would focus on the particularized
> circumstances of the crime and the defendant."
> (Emphasis added.) Gregg v. Georgia, 428 U.S.
> at 199.

Any statutory scheme therefore, to meet due process requirements
must consider not only the circumstances of the commission of
the crime, but also the particular circumstances of the individual
defendant.                                    -62-

Though it appears that the 1977 death penalty statutes allow a consideration of the particularized circumstances of the crime as well as the individual circumstances of the defendant, I shall demonstrate from the record that the sentencing court failed to consider and evaluate the individual circumstances of the defendant. Accordingly, the death sentence cannot pass the minimum standards established by the United States Supreme Court.

The statutory scheme enacted by the 1977 legislature is an attempt to comply with the demands of Gregg. It attempts to consider both the "particularized circumstances of the crime and the defendant." Section 95-2206.8 relates only to the circumstances of the crime--that is, the aggravating circumstances under which the legislature has deemed should merit a consideration of whether or not to impose the death penalty. As far as the facts are concerned in this case, we are concerned only with one aggravating circumstance set forth in subsection (7), as the sentencing court determined specifically that aggravating circumstances did not exist under remaining subsections (1) through (6). Subsection (7) provides:

> Section 95-2206.8. Aggravating circumstances are any of the following:
>
> ". . .
>
> "(7)  The offense was aggravated kidnapping which resulted in the death of the victim."

To impose the death penalty at least one aggravating circumstance must be found to exist under the statutory scheme. It was found to exist in this case, and therefore the sentencing court crossed the first hurdle allowing the imposition of the death penalty.

Mitigating circumstances required to be considered are set forth in section 95-2206.9, which contains eight subsections.

(I have previously set forth this statute in its entirety.) Subsections (2) through (7) are concerned only with mitigating circumstances surrounding the commission of the crime itself. That is, they do not involve a consideration of the particularized circumstances of the defendant as opposed to the crime itself. The sentencing court entered specific findings negating the existence of any mitigating circumstances under subsections (2) through (7). The sentencing court, however, failed to comply with either subsection (1) or (8). Subsections (1) and (8) involve a consideration of the individual defendant himself. Because the individual defendant was not considered, the minimum requirements of Gregg have not been met and the sentence must be vacated.

Subsection (1) requires the court to consider the defendant's past history as far as his involvement in crime. Subsection (8) requires the court to consider any other factor concerning the defendant that may be relevant in the decision-making process as to whether or not to impose the death penalty. I quote again from the statute:

> "Mitigating circumstances. Mitigating circumstances are any of the following:
>
> "(1) The defendant has no significant history of prior criminal activity.
>
> ". . .
>
> "(8) Any other fact exists in mitigation of the penalty." (Emphasis added.) Section 95-2206.9, R.C.M. 1947.

As I have previously explained, it is the mandatory duty of the sentencing judge to make specific findings of both statutory aggravating circumstances and statutory mitigating circumstances. Moreover, section 95-2206.11, R.C.M. 1947, requires that findings be made as to either the existence or absence of each aggravating or mitigating circumstance. This duty is imposed on the sentencing court regardless of what evidence may have been introduced by the parties at the

-64-

presence hearing. In the case of subsection (1), the sentencing court emasculated the record and the law. In the case of subsection (8), there is an utter failure to show affirmatively that the individual circumstances of the defendant were considered.

How did the sentencing court handle the factual determination of whether defendant had a "significant history of prior criminal activity?" I have previously quoted the sentencing court wherein he acknowledged that he was perplexed or annoyed shall we say, that defendant had no previous record. But one clue is provided by the statements of the sentencing court that he simply only acknowledged that defendant had no record of a previous felony conviction. Somehow the sentencing court had to establish that the defendant was a bad person before he committed the aggravated kidnapping, and therefore was beyond redemption. We thus arrive at the findings on this vital issue.

During the trial defendant's accomplice, Robert Dennis Nank, testified that on the same day of the crimes involved here, both individuals burglarized a home in Roundup, Montana, stole some rifles, and later buried them near the Roundup airport. No one else testified to these facts and neither was there corroboration evidence of this testimony--for example, the recovery of the rifles, etc. But this testimony by Nank was the key to the sentencing court's approach to subsection (1) of section 95-2206.9. Though the findings are convoluted, the effect of the findings is that the defendant did have a "significant history of prior criminal activity."

We go first to the presentence investigation report as to defendant's criminal background:

> "FBI records indicate the subject has been
> found guilty of Deliberate Homicide, Aggravated
> Kidnapping, Sexual Intercourse Without Consent.

> Date of arrest:  October 24, 1974 in
> Forsyth, Montana.
>
> ". . .
>
> "The current offenses are the only criminal
> activities this individual has ever been
> arrested for according to the FBI sheet
> submitted to this office.  No other criminal
> records could be found.  (Emphasis added.)

In setting forth the facts of the crime, the presentence

investigation report did refer to the burglary and theft

of rifles from the Roundup house, which information was of

course, taken from the State's brief relating to the first

Coleman appeal.

In entering its findings on the day of sentencing, the

sentencing court stated that it was doing so based on the

testimony and evidence presented at defendant's trial, and

based on the presentence hearing.  There is no reference at

all to any reliance on the presentence investigation report.

Because there was no evidence presented at the presentence

hearing, it is fair to conclude that the sentencing court

relied entirely on the trial testimony in determining whether

or not to impose the death penalty.

Accordingly, based entirely on Nank's uncorroborated

testimony as to the house burglary and theft of rifles, the

sentencing court entered the following finding:

> "1.  That on July 4, 1974, the defendant had
> Robert Dennis Nank were on the road on Nank's
> motorcycle on a journey which began at the
> Sheridan Veterans Administration Hospital in
> Sheridan, Wyoming, and continued through various
> towns in Montana, to Roundup, Montana.  The two
> men burglarized a home in Roundup, Montana, on
> July 4, 1974, and stole several rifles which were
> subsequently buried near the Roundup Airport . . ."
> (Emphasis added.)

From this initial finding the court then proceeded to

tie it into subsection (1) which requires the sentencing court

to determine whether the defendant has a "significant history

of prior criminal activity."  Accordingly, in his second finding

he concluded:

-66-

> "That the State has been unable to prove by
> means of record checks that the defendant
> has any other history of criminal activity.
> The only other criminal act which appears in
> the trial record in this case is the aggravated
> burglary of a home in Roundup, Montana, where
> certain guns were stolen by the defendant and
> Robert Nank on July 4, 1974. By reason of
> the foregoing, the credit in mitigation allowed
> by Section 95-2206.9(1) is not appropriate to
> this defendant." (Emphasis added.)

Without expressly stating, in legal effect the sentencing court determined that on the basis of Nank's uncorroborated testimony, the defendant did have a "prior history of criminal activity."

This conclusion is clearly erroneous. First, the sentencing court had no right to establish a "prior history of criminal activity" based entirely on the uncorroborated testimony of Nank, who, by his own testimony, was defendant's accomplice throughout the entire tragic events of July 4, 1974. Second, the effect of the finding, although not expressly stated, is that defendant did have a "prior history of criminal activity." The acts used to place a blemish on the criminal history of the defendant occurred the same day as the aggravated kidnapping, and even according to Nank, were part of a continuous course of criminal conduct. This was not the legislative intent when it directed the sentencing court to determine under section 95-2206.9(1) if the defendant had a "prior history of criminal activity." Events occurring on the same day as the crime in question hardly establish a "prior history of criminal activity." Indeed, the conclusion reached here is more revealing as to the predisposition of the sentencing court than it is revealing of the previous life patterns of the defendant in relation to his propensity to commit crimes. The findings are totally unsupported by a reasonable construction of the record and interpretation of the law.

-67-

Having effectively consigned defendant to the ranks of a previous offender insofar as section 95-2206(9)(1) is concerned, the court then entered the following conclusions with relation to aggravation and mitigation:

"The Court concludes as follows:

"1. That the aggravating circumstances set forth in Section 95-2206.8, paragraph (7) exists for the reason following:

"That the offense of aggravated kidnapping was committed by the defendant and it resulted in the death of the victim, Miss Peggy Harstad.

"2. That none of the mitigating circumstances listed in Section 95-2206.9, R.C.M. are sufficiently substantial to call for leniency. That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity." (Emphasis added.)

This determination, when coupled with the findings, leads inescapably to the conclusion that the sentencing court established a "prior history of criminal activity" of the defendant by convicting him of a house burglary and theft which occurred on the same day as the aggravated kidnapping. Moreover, it is the findings (as opposed to the conclusions) which are controlling for purposes of satisfying sections 95-2206.9(1) and 95-2206.11. The finding was that by virtue of the Roundup burglary and theft ". . . the credit in mitigation by section 95-2206.9(1) is not appropriate to this defendant." This is merely another way of saying that defendant did have a "prior history of criminal activity." Because of this clearly erroneous finding, the death sentence cannot stand.

There is, moreover, an even more glaring reason why the death sentence cannot stand--the total failure to adhere to the minimum standards of Gregg, that the record affirmatively establish that the sentencing court considered not only the

-68-

circumstances of the crime itself, but also the "particularized circumstances of . . . the defendant." In this respect, the record is utterly barren, and the death sentence must be vacated.

Since subsection (1) of section 95-2206.9 relates only to the individual's "prior history of criminal activity" the only remaining section which can possibly apply to the "particularized circumstances of . . . the defendant" is subsection (8) of the same statute. It provides:

"<u>Mitigating circumstances</u>. Mitigating circumstances <u>are</u> <u>any</u> of the following:

". . .

"(8)  Any other fact exists in mitigation of the penalty." (Emphasis added.)

Clearly, if the demands of <u>Gregg</u> are to be met, they must be met under this subsection. Otherwise, the statute itself would be unconstitutional because it did not allow a consideration of the "particularized circumstances of . . . the defendant."

The question we must ask is a simple one: Did the sentencing court consider the "particularized circumstances of . . . the defendant" before reaching the decision to impose the death sentence, and if so, what findings or determinations did it make concerning defendant as an individual?

The only way a reviewing court can tell if the defendant as an individual entered into the decision-making process of the sentencing court, is if the record and findings indicate that has in fact been done. We cannot, in a case involving a sentence of death, assume or presume that it was done.

A reviewing court cannot guess as to whether the sentencing court considered and amply weighed the "particularized circumstances of . . . the defendant." The reason is a simple one: We might make a wrong guess. Indeed, it would appear that section 95-2206.11 was enacted to eliminate that

-69-

possibility and to provide a reviewing court with the
requisite record to review the death sentence imposed.
This statute provides in pertinent part:

> ". . . the determination of the court shall
> be supported by <u>specific written findings
> of fact</u> as to the existence <u>or nonexistence
> of each</u> of the circumstances . . . set forth
> in 95-2206.9 [Mitigating Circumstances]. The
> <u>written findings shall be substantiated by
> the records of the trial and the sentencing
> proceedings.</u>" (Emphasis added.)

If this statute, when construed along with section
95-2206.9 is to pass constitutional muster under the minimum
standards established in <u>Gregg</u>, then it is clear that the
record must affirmatively establish that the "particularized
circumstances of . . . the defendant" have been considered.
If the sentencing court did not do this, then the death
sentence cannot be permitted to stand. The sentencing court
therefore is required to make findings concerning the "parti-
cularized circumstances of . . . the defendant", and since
written findings are required only when a death penalty is
imposed, it must explain why it chose to disregard defendant's
individual circumstances in determining to impose the death
penalty. The findings of the sentencing court must be
examined in light of these requirements.

In findings <u>a</u> <u>through</u> <u>e</u> of the death penalty judgment,
the sentencing court specifically found the absence of
mitigating factors (2) through (7) of section 95-2206.9.
Subsections (2) through (7) relate only to facts surrounding
the commission of the crime itself. On the other hand,
subsection (8) is ignored altogether. A reviewing court is
left entirely in the dark as to whether the sentencing court
even considered the "particularized circumstances of . . .
the defendant." In the judgment there is only one reference
to subsection (8), and that is included in a general, virtually
all-inclusive umbrella finding:

-70-

> "That there is no evidence appearing,
> either in the record of the trial held in
> this cause or the special sentencing hearing
> accorded, supporting a finding of any of the
> circumstances in mitigation under the other
> number paragraphs of Section 95-2206.9, namely
> paragraphs (2) through (8). There is, likewise,
> no evidence of any facts which are operative
> in this case to mitigate the penalty in this
> cause. . ." (Emphasis added.)

This finding hardly complies with the requirements of section 95-2206.11, let alone the demands of Gregg. We certainly learn nothing about the defendant from that finding.

The sentencing court stated in this finding that the absence of mitigating factors was gleaned from the trial itself and from the sentence hearing. This finding as to subsection (8) of section 95-2206.9 suggests two conclusions, neither of which satisfies the demands of Gregg. The first conclusion is that because no evidence was introduced at the sentencing hearing the sentencing court relied entirely on the record of the trial in reaching the decision to impose the death penalty. But there is no evidence in the trial record as to the individual circumstances of the defendant, and even more importantly, if anything concerning the defendant's individual situation was considered as a result of the trial record, we have no idea what it was. For the record is silent as to what, if anything, concerning the defendant, was considered and evaluated. Surely therefore, the sentencing court did not fulfill the demands of section 95-2306.11 or the minimum constitutional requirements of Gregg.

A second alternative is that one can be charitable to the sentencing court and conclude that because the presentence investigation report was officially made part of the record at the presentence hearing, the sentencing court would be presumed to have made use of it in determining whether or not to impose the death penalty. But in the record of the sentencing itself

-71-

there is not one reference to the presentence investigation report, and neither is there a direct reference to it in the written findings and judgment. Again, on such an imporant matter this Court cannot assume or presume that the sentencing court considered and evaluated the "particularized circumstances of . . . the defendant." It is either in the record and findings or it isn't. It isn't.

The result is that one cannot conclude from either situation that the sentencing court considered and evaluated the "particularized circumstances of . . . the defendant" before reaching its decision to impose the death penalty. This being so, the death sentence does not meet the minimum standards imposed by Gregg, and it must therefore be vacated.

There is no question that the sentencing court failed to comply with sections 95-2206.9, subsections (1) and (7). Its handling of the issue relating to defendant's "prior history of criminal activity" is a mockery. The majority did not reach the issue of whether a "history of prior criminal activity" was established by acts committed on the same day as the aggravated kidnapping. It is true that the defendant did not raise this issue, or if he did, it was inartfully obscured in the broadside attack launched against the second imposition of the death penalty; but nonetheless, it was the duty of this Court under automatic mandatory review, to determine this issue.

The same is true of the failure of the sentencing court to comply with the constitutional mandate of Gregg to consider the "particularized circumstances . . . of the defendant." Other than a consideration of a "history of prior criminal activity" as mandated under section 95-2206.9(1), R.C.M. 1947, the only section that can possibly allow for a consideration of the "individualized circumstances . . . of the defendant"

-72-

is subsection (8) of section 95-2206.9. Here, there is a total failure of the sentencing court to show this Court what factors it considered and evaluated concerning the defendant as a person. Again, I must state that this issue was only tangentially raised by the defendant, and again it was undoubtedly inartfully obscured in the broadside attack which defendant launched against the second imposition of the death penalty. But again, the statutes mandated that we review the sentence imposed to determine its compliance with the law. Furthermore, the demands of Woodson and Gregg, leave no alternative for this Court but to determine if the record affirmatively shows a consideration of the "particularized circumstances . . . of the defendant." Since it does not, it is our duty to vacate the death penalty.

The automatic review provisions for death sentences are set forth in sections 95-2206.12 through 95-2206.15, R.C.M. 1947 (now sections 46-18-307 through 46-18-310 MCA). Under section 95-2206.13, the imposition of all death sentences in this State requires this Court to review its legality and sufficiency. Section 95-2206.13 sets forth the priority of review accorded to death sentence cases, and in essence states that it shall take precedence over all other cases. Section 95-2206.14 requires that the entire record of the proceedings be forwarded to this Court.

The extent of review required is set forth in section 95-2206.15:

> "Supreme court to make determination as
> to sentence. The supreme court shall consider
> the punishment as well as any errors enumerated
> by way of appeal. With regard to the sentence,
> the court shall determine:

> "(1) whether the sentence of death was
> imposed under the influence of passion,
> prejudice, or any other arbitrary factor.

"(2) whether the evidence supports the
judge's finding of the existence or nonexistence
of the aggravating or mitigating circumstances
enumeraged in 95-2206.8 and 95-2206.9; and

"(3) whether the sentence of death is excessive
or disproportionate to the penalty imposed in
similar cases, considering both the crime and
the defendant. The court shall include in its
decision a reference to those similar cases it
took into consideration."

I cannot accept the majority's conclusions that after
an examination of subsections (1), (2), and (3) of section
95-2206.15, that the death sentence was properly and justifiably
imposed. The majority simply failed in its duties of review.

Conceding arguendo that Nank's uncorroborated testimony
was sufficient to establish that defendant committed the
house burglary and theft of rifles, the opinion is silent on
the question of whether these acts, committed on the same day
a the aggravated kidnapping, were sufficient to establish a
"history of prior criminal activity." This is not a question
of fact. It is a legal question which this Court must answer,
and has failed to do so. For this reason, the majority has
not complied with section 95-2206.15(2).

Neither has the majority explained whether the record
affirmatively establishes that the sentencing court considered
and evaluated the "particularized circumstances of . . . the
defendant" in order to be in compliance with section 95-2206(8),
and the demands of Woodson and Gregg. Not having done so, it
is clear that the majority has not complied with its review
duties under section 95-2206.15(2). Under this section the
record of the sentencing hearings and judgment must clearly
establish the "existence or nonexistence of the aggravating
or mitigating circumstances . . ." (Emphasis added.) I note
that the only reference in the majority opinion to any of
the "particularized circumstances of . . . the defendant"
is in relation to the handling of the "prior history of
criminal activity."

Nor can I accept the conclusions of the majority that the death sentence was not, pursuant to section 95-2206.15(1), "imposed under the influence of passion, prejudice, or any other arbitrary factor." The total circumstances do not support this conclusion.

Circumstantially, the conclusion is inescapable that the sentencing court orchestrated the proceedings from the very beginning so that in the event of a conviction of aggravated kidnapping, the death penalty would be imposed. Before trial on the merits, and after defendant had entered his plea of not guilty, and over defendant's objection, the sentencing court on its own motion, amended the charge of aggravated kidnapping to allege that the crime resulted in the death of the victim. At the conclusion of the trial, he submitted a special interrogatory to the jury to ask it to determine whether the aggravated kidnapping resulted in the death of the victim. As a result of this amended information and special finding of the jury, the sentencing court placed himself in a position to impose the mandatory death penalty which was then required by statute. It matters not that this Court determined the amended information and submission of the special interrogatory to the jury, to be matters of form, and to be ultimately inconsequential because the death sentence was vacated. It certainly demonstrates the state of mind of the sentencing judge.

The same kind of active involvement is evident after this Court declared the mandatory death penalty under the then existing statutes under which defendant was sentenced, to be unconstitutional. Before the sentencing court received the remittitur from this Court, indeed, before this Court had ruled on defendant's petition for rehearing, the sentencing court had ordered a presentence investigation report and ordered

-75-

the defendant immediately returned from the state prison to be placed in the Custer County jail. Apparently on the same day as the remittitur was received by the sentencing court, it sent out an order setting a presentence hearing and stated that it would be conducted under the 1977 death penalty statutes. The sentencing judge ignored our decisions on issues three and eleven which clearly indicated that this Court did not contemplate that the death penalty would be a reconsideration upon resentencing. He read in everything he possibly could to construe the first Coleman opinion to mean he could apply the 1977 death penalty statutes retroactively.

At the sentencing hearing itself, he accepted and filed the presentence investigation report, but at least as far as the record is concerned, the sentencing court ignored it, and did not consider the "particularized circumstances . . . of the defendant." He stretched the law to the breaking point to saddle the defendant with a "history of prior criminal activity", a clear misreading and misapplication of section 95-2206.9(1). He allowed final argument on the penalty to be imposed, only after he had predetermined the issue by coming to court armed with his written death sentence. He totally failed to consider the lenient treatment given to Nank who was by his own admissions, an equal participant in the crimes for which defendant was ordered to be hanged. Moreover, Nank had a previous felony record.

If these factors, individually, or at least collectively, do not demonstrate that the sentencing authority was "under the influence of passion, prejudice, or any other arbitrary factor" (emphasis added), I do not know what would. It is an easy matter for a reviewing court to find an absence of "passion, prejudice, or any other arbitrary factor" if it

-76-

views the various factors in isolation, and does not consider them together. But, they must be considered together if meaningful review is to be provided under section 95-2206.15(1). Unfortunately, in this case, these factors were not considered in isolation, let alone collectively.

The only factor considered by the majority is the failure of the prosecution to give the same plea and sentencing considerations to defendant as he had given to Nank. But the majority has entirely missed the point--for two reasons. First, the sentencing court should have made some mention of the distinctions in the penalties handed out to Nank as opposed to the defendant, but failed to do so. If the sentencing court thought there were legitimate reasons for treating the defendant differently, it was obligated to set forth those facts and reasons justifying the different treatment. This was not done, of course. Second, the majority misreads Gregg when it cites this case as justifying the different treatments.

The failure to properly apply Gregg results from the majority's reliance on the prosecution's brief in relation to Gregg. In its brief, the prosecution stated in response to defendant's argument that defendant was the victim of arbitrary and capricious treatment being that Nank was shown leniency:

> "Furthermore, leniency in one case does not invalidate the death penalty in others." Gregg, 428 U.S. at 199, 224-226.

In its opinion, the majority stated:

> "Leniency in one case does not invalidate the death penalty in others." Gregg, 428 U.S. at 199, 224-226.

The State made no effort in its brief to explain or expand upon this interpretation of Gregg, and neither did the majority opinion. Suffice to say that Gregg does not apply to the facts of this case. It was hardly appropriate for

-77-

the majority to rely on this statement of the State in
its brief as it is nothing more than a continuing and unrelenting
effort to salvage the death sentence imposed in this case,
without regard to a fair and dispassionate interpretation
of the law or facts.

The basic thrust of the statement in Gregg was that a
defendant handed the death sentence cannot complain that he
has been the victim of arbitrary and capricious conduct simply
because another defendant, in another case, has for some reason
been the beneficiary of a prosecutor's mercy. That is a far
cry from the situation here where Nank admitted committing
precisely the same crimes of which the defendant was convicted
by a jury. But, Nank was shown mercy: the defendant was
sentenced to hang. This can hardly be interpreted as a just
and evenhanded application of the law.

On May 7, 1975, Robert Nank agreed to cooperate with
the State in its prosecution of the defendant. In exchange
for this cooperation, he received certain benefits--primarily
a dismissal of the charge of aggravated kidnapping charge
which eliminated the possibility that the death penalty would
be imposed. Sixteen days later, defendant Coleman, though
still maintaining his innocence, offered to plead guilty to
the same charges to which Nank had pleaded guilty, but insisted
on maintaining his innocence. The State refused his offer.
The case against defendant went to trial in essence because
defendant refused to admit his guilt. Primarily on the basis
of Nank's testimony, he was convicted of all charges, including
the crime of aggravated kidnapping.

The majority has grounded part of its opinion on the
first Coleman case wherein the majority held that it was not
improper for the prosecution to/ refuse to accept defendant Coleman's
conditional offer to plead guilty. Although the prosecutor

-78-

did have the discretion to refuse this conditional plea offer, the consequences which followed are not fair in the slightest degree. Nor should they be tolerated.

Conceding that the prosecutor had the right to refuse the conditional plea offer, it does not establish that the conditional plea offer was constitutionally infirm. At least, that is the law of the United States Constitution. In North Carolina v. Alford (1970), 400 U.S. 25, 97 S.Ct. 160, 27 L.Ed.2d 162, it was held that there is no constitutional error in accepting a guilty plea which contains a protestation of innocence. Accordingly, at least, under the United States Constitution the prosecutor and sentencing court could have accepted the conditional plea of guilty. If they had, the defendant could not later withdraw his plea.

It is important to note however, that the record does not affirmatively establish why the conditional plea was not accepted. That is, it does not establish that the prosecutor would have treated defendant just like Nank if he would unconditionally plead guilty to the charges. We cannot conclude therefore, that the prosecutor ever promised defendant the same treatment as Nank. In terms of plea bargaining the American Bar Association has established its position relating to similarly situated defendants:

> "Similarly situated defendants should be
> afforded equal plea agreement opportunities."
> (American Bar Association on Standards for
> Criminal Justice, Standards Relating to The
> Prosecution Function and the Defense Function,
> approved draft (1971), at 102.)

There is no showing in the record that the prosecutor ever offered the same terms to defendant as he did to Nank, and yet there is not a better illustration of similarly situated defendants. Under the circumstances of this case, there was a clear affirmative duty for the prosecutor to establish

-79-

that he offered the same plea bargain to defendant as he did to Nank. The prosecutor did not and cannot meet that burden.

There is no question that absent Nank's accomplice testimony, the State would have insufficient evidence to convict defendant. But once it struck the plea bargain with Nank it had the evidence to convict defendant of the charges if the jury believed Nank's testimony. The record establishes, that is, Nank's confession and Nank's testimony at trial, establishes that Nank and defendant committed the same acts against the victim. The effect in terms of sentencing, however, is that because the State could not convict defendant without Nank's testimony, it struck a bargain to keep one man alive in exchange for the possibility of ultimately putting one man to death--the defendant. The jury verdict against the defendant, based on Nank's testimony, set in motion the ultimate imposition of the death penalty. Such disparate results from such similar criminal acts, cannot be countenanced by society, and certainly should never be countenanced by the courts. The majority has performed a great injustice by ratification of this unequal treatment.

There are two procedural matters concerning the sentencing proceedings that need some clarification. The majority has concluded that defendant was not deprived of an opportunity to present oral arguments at the presentence hearing, and moreover, that in essence, defendant waived further rights to present meaningful arguments by not presenting proposed findings of fact to the sentencing court after having been invited to do so. On this basis, the majority concludes:

> "Thus, defendant and his counsel had at least
> two opportunities to submit argument to the
> Court regarding the death penalty prior to
> July 10, 1978 hearing, but did not do so."

-80-

This conclusion has greatly distorted the realities of the situation.

I have already discussed the proceedings which took place during the so-called sentencing hearing. As neither party submitted any evidence at the presentence hearing, and the only document filed at the presentence hearing was the presentence investigation report, it was agreed that both parties would submit briefs to the sentencing court with regard to their respective positions. This apparently was done, although this Court does not have the benefit of those briefs. In addition, the sentencing court invited both sides to submit proposed findings and conclusions, but only the prosecutor indicated positively that he would do so. The sentencing court did not tell the parties that submission of briefs would constitute a waiver of oral argument concerning the penalty to be imposed. It is logical to assume that before sentencing, defense counsel believed that he would have an opportunity to make a meaningful and effective oral argument against imposition of the death penalty. Clearly, the sentencing court did not comply with the spirit of section 95-2206.7, which provides in pertinent part:

> ". . . The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death." (Emphasis added.)

The word "shall" is mandatory. For it to be meaningful, the implication is that argument shall be presented before the sentencing court makes its decision. But such is not the case here. True, the sentencing court, on July 10, 1978, allowed defense counsel to argue against imposition of the death penalty, and the state to argue for imposition of the death penalty. But by this time the court had already decided to impose the death penalty. The sentencing court had come to court with its written death sentence already prepared. As I

-81-

have previously mentioned, insofar as the defendant is concerned, this is akin to allowing defense counsel in a criminal case to make final arguments to the jury only after the jury has returned with its guilty verdict. Under these circumstances, it cannot be reasonably argued that defendant was given a meaningful opportunity to argue against the death penalty when the decision to hang had already been made. This not only violated the spirit of section 95-2206.7, it also constitutes a denial of the effective assistance of counsel.

Nor is it reasonable to conclude as did the sentencing court, and the majority here, that defendant effectively waived another opportunity to argue against the imposition of the death sentence by failing to submit proposed findings of fact and conclusions of law. It is true that the sentencing court invited defense counsel and the prosecutor to submit proposed written findings and conclusions; but only the prosecutor responded that he would do so. The prosecutor did present proposed findings and conclusions. But does the sentencing court truly believe, does the majority truly believe, that the tide could well have been turned for the defendant if only his lawyer had presented proposed findings of fact? How far must we bury our head in the sand?

Indeed, the statute calling for "specific written findings of fact" clearly operates only when a decision is made to take a defendant's life. Section 95-2206.11, provides in relevant part:

> "In <u>each</u> <u>case</u> in which the court <u>imposes</u>
> the <u>death</u> <u>sentence</u>, the determination of
> the <u>court</u> <u>shall be</u> supported by specific
> written findings of fact . . ." (Emphasis
> added.)

This statute leaves no doubt that findings are required only in the event of a decision to impose the death penalty; and the statute certainly places no duty upon the defendant to

make those proposals. The duty is that of the court and the court alone to support its death sentence with the required "specific written findings of fact." To impose a duty and burden of persuasion upon the defendant to present his own proposed findings of fact is clearly beyond the contemplation of the statute, and beyond any duty that this Court should gratuitously impose on the defendant.

What if the defendant's counsel did submit proposed findings of fact? We may safely assume they would have led to the inexorable conclusion that defendant's life should be spared. But, if the sentencing court spared defendant's life, the proposed findings would not serve any function whatsoever. Since the decision to grant mercy is one in which no findings of fact are required, and it also being obvious that the State has no appeal from such a decision, the proposed findings most likely would have found their way to the trash can. Furthermore, the majority ignores the primary function of findings of fact in terms of the decision-making process at the trial level.

If trial judges and trial lawyers are candid, they will admit that proposed findings are prepared and submitted by counsel to assure that in the event the trial court finds in their favor that all the bases are covered in the event of an appeal. They are submitted possibly with the hope, but rarely if ever, with the expectation that the proposed findings will actually be a decisive factor in influencing the trial court to rule in favor of one's client. Indeed, it has been my experience, and an unfortunate one from the standpoint of appellate review, that most often the trial court simply rubber stamps the proposed findings of the winning side. Rarely do we get any insight as to what the decision-making process was, or how the trial court in fact viewed the evidence at trial.

-83-

In the instant case, I do not know how closely the findings of fact parroted the proposed findings submitted by the prosecutor, as the proposed findings are not a part of the record on appeal.

An examination of the findings entered in this case does not give a reviewing court any insight as to what the fact finder was thinking; that is, what factors were actually involved in motivating and impelling his decision to impose the death penalty. The findings are cold and calculated and set out with staccato precision—but hardly a revelation as to the reasons for concluding the defendant must die. In considering and weighing the totality of circumstances surrounding the commission of the crimes by defendant, and by Nank, and in considering and weighing the totality of circumstances surrounding the "particularized circumstances of . . . the defendant", what actually impelled the sentencing court to sentence defendant to hang while at the same time he knew that an equally guilty accomplice would not hang? The record is silent as to these factors—the real reasons hidden forever in the bosom of the court. The findings are more revealing for what they don't say than for what they do say.

It is clear beyond question that defendant's presentation of proposed findings, in addition to not being required, would have been a manifest exercise of futility. Findings of fact collaborated in by a thousand William Shakespeares could not have deterred the sentencing court from its chartered course. Does any member of the majority truly believe otherwise? Under these circumstances to conclude that proposed findings of fact are a form of argument calculated to have and with a reasonable possibility of having a certain persuasive effect on the sentencing court, is utter nonsense.

Before discussing the majority position that only cases involving imposition of the death penalty must be reviewed by this Court, I emphasize that I do not contend defendant would have to be treated exactly like Nank in terms of the sentencing imposed. In the case of Nank, the charge of aggravated kidnapping was dropped as part of a plea bargain agreement and obviously he could not be sentenced at all for that crime. But since defendant was convicted by a jury of three crimes (including, of course, that of aggravated kidnapping), he could have been sentenced for all three crimes. The sentencing court went one step too far when it sentenced the defendant to hang.

One of the purposes of appellate review is as the majority states, "to serve as 'a check against the random or arbitrary imposition of the death penalty'", citing Gregg, 428 U.S. at 206. But Gregg did not hold that only other death penalty sentences need be compared. Nor do I believe the Georgia case relied on by the majority (Moore v. State (1975), 233 Ga. 861, 213 S.E.2d 829) is authority for the majority position in light of the wording of the statutory review scheme in this state. Section 95-2206.15 does not so limit our review. It provides in relevant part:

"Supreme Court to make determination as to sentence.

"The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:

". . .

"(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration."

If only a comparison with other death sentences was intended, the legislature would have inserted the word "death" before the word "penalty".

If the actual purpose of mandatory review (mandated by the United States Constitution) is to check against "the random or arbitrary imposition of the death penalty", I fail to see how such review can be fairly and effectively fulfilled without a comparison with those cases wherein the death penalty could have been imposed, but for some reason was not. Factors which may lead a sentencing court to not impose the death penalty may well be worthy of consideration by a reviewing court in determining whether a particular case under review merits the same considerations. A sentencing judge may have sound and persuasive reasons why he did not impose a death penalty in a particular case. This court should not deny access to this decision in determining whether or not a case we are reviewing may merit the same outcome.

I am not unaware, however, of the practical problems involved in getting access to such cases. For example, section 95-2206.11, which I have previously discussed in relation to another point, clearly requires "specific written findings of fact" only when the death penalty _is_ imposed. If such findings are not entered, and if a decision of a sentencing court is not filed explaining its reasons for not imposing a death sentence in a particular case, for all practical purposes this Court would be deprived of the benefit of this decision for review purposes. But, I believe that a failure to use such cases for comparison is a denial of effective review, particularly since mandatory review is required by decisions of the United States Supreme Court.

There are additional practical problems in seeking to fairly apply a statutory scheme of capital punishment. The vagaries of the components entering into the decision-making process of the prosecutor and the sentencing judge are too many and mostly never become a matter of record so that a reviewing court can consider them. Whether the death penalty

will be imposed in a particular case will depend almost entirely on the personal beliefs and attitudes of the prosecuting attorney and the judge who is on the case. Many prosecutors would be loathe to seek the death penalty. On the other hand there are those who would not hesitate in determining that the death penalty is the appropriate and only punishment. The same is true of the judge who is on the case. Many judges would be loathe to impose the death penalty. On the other hand, there are those who are known as "hanging judges". To them, the death penalty should be imposed more often and in a wider variety of cases. Furthermore, there are many political considerations which operate upon prosecutors and judges in determining whether the death penalty will be imposed. A defendant may be sentenced to death solely because the right combination of prosecutor and sentencing judge operated in tandem in reaching the decision to impose the death penalty.

Of course, many decisions are made disposing of the death penalty aspects of a case long before a defendant either pleads guilty to a capital crime or is found guilty by a jury. In many cases, a threat of the death penalty hanging over a defendant may induce him to plead guilty to a crime in exchange for the promise of a prosecutor to eliminate the death penalty aspects of the charge involved, or a promise not to seek the death penalty. It would be extremely difficult, to say the least, for a reviewing court to obtain sufficient information concerning these cases so as to compare them with a death sentence currently under review.

I point out these factors only to stress my belief that it is virtually impossible to rationally and fairly administer and enforce a statutory scheme of capital punishment. But

since capital punishment as a permissible means of punishment seems now to be an accomplished fact, this Court should spare no efforts in seeing that it is administered as fairly as we are capable of doing it. To use only cases imposing the death penalty as a comparison with a case under review, fails miserably in this objective. Somehow the whole process of meaningful appellate review is diminished.

The majority has dismissed with no meaningful discussion the defendant's contention that a jury should have been allowed to determine whether or not the death penalty should be imposed. Perhaps it is not a constitutional requirement under the United States Constitution, but I am convinced that in the long run, with all the inherent frailties which a scheme of capital punishment entails, a jury will arrive at a more even-handed application of the law to the facts than will a judge. There are no sound policy reasons why, with appropriate guidelines and instructions, a jury should not be allowed to make that fateful and final decision as to whether a person will live or die. We entrust juries with very important decisions in our legal system; there is no reason why we should not entrust them with this ultimate decision. The ultimate power of life or death should never be reposed in a single person as it is under our present statutes.

If a jury had decided this case, I am convinced that it would immediately have recognized the fundamental unfairness of allowing Nank to live but ordering Coleman to die. A jury would have established its own fundamental fairness and sense of justice by deciding that neither should Coleman be compelled to pay with his life. If a jury is the "conscience of the community", there is every reason for allowing this collective conscience to render a final verdict as to life or death.

-88-

I arrive now at the final matter for discussion, and that is whether the judge who imposed the initial death penalty should have been permitted to again preside at the second sentencing. This question was not directly raised by defendant, but it was impliedly raised by his contention that he was denied opportunities for effective argument during the proceedings relating to the second sentencing. Clearly, the sentencing judge should not have presided over the second sentencing. But the problem arises as to the steps to be taken to obtain a new judge for the second resentencing. Plainly stated, there is no procedure other than the sentencing judge voluntarily stepping aside for the second sentencing.

It is clear from the beginning of this case that the sentencing court had an inordinate amount of involvement directed to the ultimate end of imposing the death penalty. By amending the information after defendant had entered his plea of not guilty and over the objection of defendant, and by submitting the special interrogatory to the jury, the sentencing court expressed an undeniable interest in the crime of aggravated kidnapping. A conviction of that crime mandated the imposition of the death penalty. By virtue of the amended information and the jury's answer to the special interrogatory, the defendant was then in a position where the mandatory death penalty could be imposed. This involvement continued immediately after this Court declared the 1974 death penalty statutes to be unconstitutional when the sentencing court immediately sent a letter to counsel that he would conduct a sentencing hearing under the 1977 death penalty statutes. I have elsewhere related the additional activities of the sentencing court in ultimately deciding to impose the death penalty.

-89-

Unfortunately, our present court rules on disqualification do not provide for the disqualification of a judge in a situation where a case has been remanded only for resentencing as opposed to a reversal for a new trial. This rule is set forth in 34 St.Rep. 26. In the context of this case, this rule provides only that a party can file a peremptory motion to substitute a judge if this Court has ordered a new trial. There is also a provision for disqualification for cause, but it is extremely difficult to invoke, and rarely is a successful instrument of obtaining a change of judge. There is an argument that the peremptory disqualification rule could be interpreted to apply also to a remand for resentencing, but in any event, defendant did not move to peremptorily disqualify the sentencing judge. Accordingly, that issue is not directly before this Court.

Nonetheless, this case raises some fundamental problems concerning the right to a new judge for resentencing, particularly when the death penalty has already been imposed the first time and there is even the slightest possibility that it will again be imposed. The policy behind the right to a new judge after a _reversal_ was stated in King v. Superior Court, In and For County of Maricopa (1972), 108 Ariz. 492, 502 P.2d 529, where the Arizona Supreme Court stated:

> "In the case of an appeal, reversal and
> a remand for a new trial, it is always
> possible that the trial judge may subconsciously
> resent the lawyer or defendant who got the
> judgment reversed. The _mere_ _possibility_ of
> such a thought in the back of a trial judge's
> mind means that a new judge should be found."
> (Emphasis added). 502 P.2d at 530.

In that case the Arizona Supreme Court was construing a rule of procedure similar to the rule of this state. There is no reason, of course, why this same "mere possibility would not exist in the case of a remand for resentencing. Without question

-90-

the "mere possibility" would exist in a case where there was even the slightest possibility that the death penalty could again be imposed upon the resentencing. Under these circumstances, there is absolutely no reason why the defendant should have to face the same judge twice.

The problem however is that Montana's rule, like Arizona's, is not self-executing. Unless a trial judge or sentencing judge has a twinge of conscience and voluntarily steps aside, there is no way presently to make him do so. The problem is more complicated here because the defendant did not ask the sentencing judge to step aside. Nonetheless, where such an extreme penalty such as the death penalty is involved, I think it incumbent upon this Court to make our own determination as to whether, under the objective reasonable man test, the defendant was deprived of a fair and impartial judge to preside over the sentencing hearing and to ultimately impose sentence.

There is no question that the sentencing court should have known that a reasonable man would look askance at his again presiding over the resentencing. He should have disqualified himself; but being that he did not do so, this Court should not allow the death sentence to stand based on an application of the reasonable man test. In criminal trials (which obviously must include criminal sentencings) the American Bar Association has adopted standards that provide:

> "The trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can reasonably be questioned." American Bar Association on Standards for Criminal Justice The Function of the Trial Judge, (1972), p. 8.

The test for determining when a trial judge should step aside is an objective one, not a subjective one. It has been stated as follows:

> "Would a person of ordinary prudence knowing
> all of the facts known to the judge find that
> there is a reasonable basis for questioning
> the judge's impartiality?"  Thode <u>The</u> <u>Code</u>
> <u>of</u> <u>Judicial</u> <u>Conduct--The</u> <u>First</u> <u>Five</u> <u>Years</u>
> (1977), Utah L.Rev. at 402.

Although this Court has not adopted this Code of Judicial

Conduct, the rule is but a rule of common sense and has

existed long before the adoption of the canons discussed in

the law review article.

In the case of <u>In Re Hupp's Estate</u>  (1955), 178 Kan.
432,
672, 291 P.2d 428,/the Kansas Supreme Court reiterated the

rule declared in Tootle v. Berkley (1899), 60 Kan. 446, 56

P. 755, where it stated:

> ". . . when circumstances and conditions
> surrounding litigation are of such nature
> they might cast  doubt and question as to
> the fairness or impartiality of any judgment
> the trial judge may pronounce, such judge,
> even though he is not conscious of any bias
> or prejudice, should disqualify himself and
> permit the case in question to be tried before
> a judge pro tem."

It is true that these cases were decided under circumstances

where a party moved at the lower court to remove a judge from

a case, but where he refused; or where a party was successful

in removing a judge from the bench, but where the other party

contended upon appeal that the judge should not have removed

himself.  But if these rules are to have any substantive

meaning, particularly in a death penalty case, it should not

be necessary that the defendant have moved to have the judge

step aside in favor of another judge.  The sentencing court

should be ever mindful that this Court will, under the reasonable

man test, scrutinize the proceedings, and if we determine that

the sentencing judge has failed the reasonable man test, we

will remand the case for resentencing and order a new judge

to preside.

-92-

In a death penalty case, this Court has an overriding duty, regardless of the existing rules of procedure governing the disqualification of judges, to determine if from the entire record and the totality of circumstances, the defendant has had a fair hearing. Here, he clearly did not. I would vacate the death penalty and order that a new judge be called in to preside over the sentencing hearings.

To set forth my positions concerning the sentencing hearing, and more particularly, the written findings of fact entered by the sentencing court, I have of necessity had to quote from many of the written findings. There is always the danger that the reader may conclude that if the written findings were reviewed in their entirety perhaps they would not support my position. For this reason, I have appended to this dissent as Exhibit A, an exact copy of the Findings, Conclusions, Judgment and Order entered by the sentencing court on July 10, 1978, whereby the defendant was sentenced to hang.

For all of the foregoing reasons I would vacate the death sentence imposed in this case, order that a different district judge be called in to preside again at the sentencing of defendant, and further order that the death penalty is not to be considered.

_Daniel J. Shea_
Justice

IN THE DISTRICT COURT OF THE SIXTEENTH JUDICIAL DISTRICT OF

THE STATE OF MONTANA, IN AND FOR THE COUNTY OF ROSEBUD

CASE NO. ___1083___

FILE NO. _____

FILED _July 10 1978_

_____ CLERK

_____ DEPUTY

* * * * * * * *

STATE OF MONTANA )
    Plaintiff )
            )          No. 1083
vs )
            )    FINDINGS, CONCLUSIONS, JUDGMENT
DEWEY EUGENE COLEMAN )          AND ORDER
    Defendant )

* * * * * * * *

Pursuant to an Information filed on the 24th day of October, 1974, Dewey Eugene Coleman, defendant herein, was charged with the crimes of Deliberate Homicide, Aggravated Kidnapping and Sexual Intercourse Without Consent. A jury trial commenced October 23, 1975, and continued through November 14, 1975, at which time the Jury returned verdicts of "guilty" on the three counts. On November 21, 1975, this Court sentenced Coleman to the maximum punishment on each charge, that is: The defendant was sentenced to death for Aggravated Kidnapping; he was sentenced to 100 years for Deliberate Homicide; and he was sentenced to 40 years for Sexual Intercourse Without Consent. These sentences were ordered to be served consecutively.

This matter was appealed to the Montana Supreme Court, which in its decision of April 26, 1978, upheld each of the three convictions, but remanded this matter for re-sentencing. The Supreme Court held that there was no showing of the infliction of bodily injury during the course of the rape of the victim, and that, therefore, in the absence of that aggravating circumstance the maximum penalty for the crime is 20 years. The Supreme Court also held that Section 94-5-304, R.C.M. 1947, is unconstitutional because it proscribes a mandatory imposition of the death penalty. The Court rejected the defendant's claim that two jurors were excused for cause in violation of the Witherspoon Rule because of their views on capital punishment. The Court limited its decision on over turning the death penalty to the absence of procedural requirements allowing the trial Court to consider any mitigating circumstances in its imposition of a

-1-

penalty under the unconstitutional death penalty statute. The Court stated, as follows:

> "Under this statute, if the court finds, as it did in this case, that the victim of an aggravated kidnapping died as a result of the crime, the convicted defendant must be sentenced to die. There is no provision for the trial court to consider any mitigating circumstances. It only allows the court to determine the aggravating circumstances of death. This is not constitutionally permissible.
>
> To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures. See: <u>Gregg v. Georgia</u>, (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; <u>Proffitt v. Florida</u>, (1976), 428 U.S. 242, 94 S.Ct. 2960, 49 L.Ed.2d 913; <u>Jurek v. Texas</u>, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. None of those required procedures are present in Montana's death penalty statute as it existed in 1974, nor were they provided otherwise in this case. Thus, defendant's death sentence cannot stand."

On the 14th day of June, 1978, a separate sentencing hearing was held to determine the existence or non-existence of aggravating circumstances or mitigating circumstances in line with the provisions of Sec 95-2206.6, 95-2206.7, 95-2206.8 and 95-2206.9, R.C.M., 1947. At time of the sentencing hearing the defendant filed a Motion to Quash, and when offered an opportunity to present evidence or any matter in mitigation, declined to do so. Following the hearing the court granted the state and the defendant time to file briefs particularly with reference to defendant's Motion to Quash. Briefs and the law having been considered, the trial court addresses the principal legal issues raised.

As noted by Coleman in his appellate brief (pp 178, 179) Sec. 95-5-304, R.C.M., 1947, originally provided that "A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds the victim is dead as a result of the criminal conduct <u>unless there are mitigating circumstances</u>." The legislature amended this section by striking the portion of the

Star
Printing Co.
Miles City,
Mont.

-2-

language underlined above. This legislative action, made it clear that the sentencing court need not consider mitigating circumstances upon conviction of aggravated kidnapping. As pointed out above the statute as amended was declared unconstitutional in this case, but the Supreme Court in remanding for resentencing did not specifically declare if the trial court could or could not impose the death penalty. Coleman argues that since the mandatory statute was declared unconstitutional, Coleman cannot be sentenced to death under laws enacted after his conviction.

The Supreme Court at page 11 of its opinion indicates that if the death penalty had been imposed under proper procedural safeguards, the sentence would have been upheld. The Court states:

"To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures. (citations) None of these required procedures are present in Montana's death penalty statute as it existed in 1975, nor were they provided otherwise in this case. (emphasis supplied) Thus defendant's death sentence cannot stand."

The emphasized language strongly suggests that if the sentencing court had observed procedural requirements declared by recent U. S. Supreme Court decisions, the death penalty would have been upheld notwithstanding that Montana's mandatory law was unconstitutional.

The later enactment of Sections 95-2206.6, et seq, spelling out the procedure, should not operate to take away the court's power to impose the death penalty under proper procedural safeguards. The death penalty is an operative fact under the Montana Constitution and Section 95-5-303, R.C.M. 1947, and are not to be

-2A-

ignored because a procedurally defective statute is abrogated and other statutes are substituted therefor. As argued by the State from the Dobbert case, the circumstance that the defendant is afforded greater procedural protection by the trial court's utilization of sections 95-2206.6, et seq., does not fall within the prohibition of ex post facto laws.

In summary, the trial court in now pronouncing sentence is in a position to utilize the interim developments in sentencing procedure as reflected in recent U. S. Supreme Court decisions and the Montana statutes enacted in response thereto.

Both parties having been given the opportunity to place before the Court all matters each deemed relevant and competent bearing upon a determination of appropriate sentences to be imposed upon the three guilty jury verdicts rendered, and the Court having reviewed all matters submitted, together with the evidence produced at trial, and after observing the defendant's demeanor during the trial and while testifying on his own behalf, the Court now makes the following Findings, Conclusions, Judgment and Order.

FINDINGS

1. That on July 4, 1974, the defendant and Robert Dennis Nank were on the road on Nank's motorcycle on a journey which began at the Sheridan Veterans Administration Hospital in Sheridan, Wyoming, and continued through various towns in Montana to Roundup, Montana. The two men burglarized a home in Roundup, Montana, on July 4, 1974, and stole several rifles which

-2B-

Star Printing Co. Miles City, Mont.

were subsequently buried near the Roundup Airport. Later in the day the two men decided that they would rob someone along U.S. Highway No. 12 between Roundup, Montana, and Forsyth, Montana, and that they would kill the witnesses to destroy the evidence. With the motorcycle alongside the road, they began hitchhiking. A car occupied by a Mr. and Mrs. Paul Koester of Forsyth, Montana, stopped, but were frightened and left hurriedly as the defendant moved to obtain entry into the vehicle. At about 10:00 P.M. Miss Peggy Harstad of Rosebud, Montana, stopped and offered the two men a ride. They took control of her and her automobile, tied her with a rope, and took her to a remote location north of Vananda, Montana, where both men attempted to engage sexual intercourse without consent with her. The victim was in mensturation at the time. Holding her upon her back in the rear of the automobile, the defendant engaged in the act of sexual intercourse without consent, while the victim pleaded with him not to. They drove through Forsyth to a secluded spot adjacent to the frontage road just east of Forsyth, Montana, where Coleman announced his decision to kill Miss Harstad. They then drove back through Forsyth to the bridge on U.S. Highway No. 12 over the Yellowstone River to an isolated area across the Yellowstone River from Forsyth near an abandoned Milwaukee Railroad depot. In this area Coleman initiated the assault upon the victim by swinging his motorcycle helmet by the chin strap and crashing it against the victim's head. Then the defendant placed the yellow nylon rope around the victim's neck and attempted to strangle her. Then both the defendant and Robert Nank carried the victim down to a slough and, the defendant held her under the water. The victim rose out of the water briefly and then both men went into the water and held her under until she expired.

2. That the State has been unable to prove by means of record checks that the defendant has any other history of criminal activity. The only other criminal act which appears in the trial record in this cause is the aggravated burglary of a home in Roundup, Montana, where certain guns were

-3-

stolen by the defendant and Robert Nank on July 4, 1974. By reason of the foregoing, the credit in mitigation allowed by Section 95-2206.9(1) is not appropriate to this defendant.

3. That there is no evidence appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other numbered paragraphs of Section 95-2206.9, namely paragraphs (2) through (8). There is, likewise, no evidence of any facts which are operative in this case to mitigate the penalty in this cause. The Court therefore finds, as follows:

a. That the offenses charged and proven in this cause were not committed while the defendant was under the influence of any mental or emotional disturbance; and

b. That in committing the acts charged and proved the defendant did not act under extreme duress or under the substantial domination of another person, rather the defendant's decisions to kidnap, rape and murder were the result of conscious deliberation and were his independent decisions arrived at despite contrary arguments advanced by Robert Nank against the murder of the victim; and

c. That the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; and

d. That the victim was not a participant in the defendant's conduct and did not consent to any of the acts, rather that she resisted, and pleaded with the defendant at various times throughout the course of events which resulted in her death; and

e. That the defendant was not a relatively minor accomplice, nor was his participation in the offenses relatively minor, rather that the defendant was the decisionmaker and the dominating influence in the criminal acts committed against the victim; and

f. That the defendant at the time of the commission of the offenses was 27 years of age.

-4-

4. That at the prior sentencing hearing, this Court imposed the sentence of 100 years for the crime of deliberate homicide. That at the prior sentencing hearing the Court imposed the sentence of 40 years for sexual intercourse without consent; that these sentences were ordered to run consecutively.

## CONCLUSIONS

The Court concludes as follows:

1. That the aggravating circumstances set forth in Section 95-2206.8, paragraph (7) exists for the reason following:

That the offense of aggravated kidnapping was committed by the defendant and it resulted in the death of the victim, Miss Peggy Harstad.

2. That none of the mitigating circumstances listed in Section 95-2206.9 R.C.M. are sufficiently substantial to call for leniency. That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity.

From the foregoing Findings and Conclusions, the Court now renders its

## JUDGMENT and ORDER

as follows:

1. The defendant, Dewey Eugene Coleman, having been found guilty of the crime of Aggravated Kidnapping by a jury on November 14, 1975, and the Court having specifically found beyond a reasonable doubt that the aggravating circumstances set forth in Section 95-2206.8(7) exist in relation to this offense, and that no circumstances exist in mitigation of the penalty, the defendant, Dewey Eugene Coleman, is hereby sentenced to death for the crime of Aggravated Kidnapping. Said punishment is to be inflicted by hanging Dewey Eugene Coleman by the neck until he is dead between the hours of six o'clock A.M. and six o'clock P.M. on the 31st day following the completion of the automatic review of this case by the Montana Supreme Court. The execution of said sentence shall be supervised by the Sheriff of Yellowstone County pursuant to Section 95-2303 R.C.M. 1947.

-5-

STATE
BLISHING CO
LENA. MONT.

3

2. The defendant, Dewey Eugene Coleman, having been found guilty of the crime of Sexual Intercourse Without Consent by a jury on November 14, 1975, the defendant, Dewey Eugene Coleman, is hereby sentenced to be imprisoned in the Montana State Penitentiary for a term of 20 years for the crime of Sexual Intercourse Without Consent.

3. The sentences hereby imposed are to be served consecutively with the sentence of 100 years for Deliberate Homicide which is not disturbed hereby. The defendant is hereby remanded to the custody of the Rosebud County Sheriff to be transported by him to the Montana State Penitentiary to await the final order of this Court pertaining to the execution of the remainder of the sentence herewith imposed. The defendant is to receive credit for time served, from the date of his initial incarceration on these charges on October 17, 1974, to the date of this judgment.

Dated this _16_ day of _July_ , 1978.

A. B. Martin
District Judge

cc: John S. Forsythe
    Charles F. Moses

-6-